[No. D004469. Fourth Dist., Div. One. Nov. 17, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY G. JAMES, Defendant and Appellant.

COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

TODD, J.—A jury found Larry G. James guilty of murder (Pen. Code, § 187)[1] in the first degree under a theory of murder by torture (§ 189) and willful cruelty toward a child (§ 273a, subd. (1)). James appeals after the trial court sentenced him to prison for 25 years to life.

### FACTS

James met Jane H. (Jane) in Australia in 1981, when he was on tour duty with the United States Navy. They communicated over the next three years by letters and telephone calls. On August 10, 1984, Jane and her daughter Christa, who was born on June 25, 1981, arrived in the United States and moved into an apartment with James. James and Jane were married on October 20, 1984. Over the next five months, Christa sustained numerous injuries, culminating in her death on March 30, 1985. The evidence against James revolved principally around two incidents: the first on January 3, 1985, when Christa was taken to Balboa Naval Hospital; and the second on March 30, 1985, when Christa died of multiple internal injuries. The prosecution's expert witnesses testified that the injuries Christa sustained on both occasions were nonaccidental and indicated child abuse—in particular, the battered child syndrome. The prosecution also presented a series of lay witnesses who testified they observed or overheard various incidents involving Christa and James.

### A. *The January 3, 1985, Incident*

James, Jane and Christa were home on January 3, 1985, when Jane decided to go to the store to buy some cigarettes. Christa wanted to go, but

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Jane told her she could not because it was late and cool. When Jane returned in five minutes, Christa, who was lying on the couch, said her ankle had popped. James told Jane he had swung Christa by her legs when the injury occurred. James carried Christa to the car to go to Balboa Naval Hospital. A friend, Earl Lightfoot, who had come over to the apartment, followed them to the hospital. Christa was later transferred to Children's Hospital. Both Jane and James told a hospital social worker that Christa was happy and laughing and playing with James when Jane went on the brief errand. Lightfoot testified Christa was not crying and told him her leg was hurt while she was playing with James. A pediatric nurse, however, testified that Christa told her that James had become angry with her and twisted her ankle until it broke. The nurse said Christa told her James was angry because she would not stop crying when her mother would not take her to the store.

Christa was diagnosed as NAT (not accidental trauma) and as a victim of child abuse. X-rays showed that in addition to a broken leg (spiral fracture of the tibia), Christa had a fracture of the right wrist (involving both the radius and the ulna). Dr. David Chadwick opined the wrist injuries were three to six weeks old. Jane told the social worker that a neighborhood child had pushed Christa off her tricycle sometime before Thanksgiving. Jane said she noticed swelling and discomfort and asked several people if they thought Christa's wrist was broken. She said she sought advice from a local pharmacist and was advised to soak the wrist, which she believed was sprained, in Epsom salts.[2] Other injuries noted while Christa was in the hospital included: (1) circular bruises on both buttocks, ranging in age from two days to four-to-seven days; (2) bruises behind both ears that were two to four days old;[3] and (3) bruises on the tops of Christa's feet.[4] Additionally, a nurse testified that she helped Christa go to the toilet. The nurse said when she started to wipe Christa and touched her perianal area, Christa cried. Christa told another nurse the perianal area hurt because James had stuck his fingernail there.

A petition was filed on Christa's behalf in juvenile court and Christa was released from the hospital to a foster home. James and Jane visited Christa

[2]The pharmacist testified he did not recall talking to Jane about Christa's injury and denied he would have recommended Epsom salts for a sprain.

[3]Jane told doctors that Christa had run into the doorknob at their home. But, based on measurements of the doorknobs in the apartment and Christa's height, Dr. Chadwick opined the doorknobs did not cause these injuries.

[4]A pediatric nurse testified she asked Christa how she received bruises and Christa responded, "I wasn't even naughty and my feet were stepped on hard." Dr. Chadwick said the bruises were consistent with either "grab marks" or with being hit by an object. Chadwick said he did not believe the explanation of someone stepping on Christa's feet. Chadwick said the foot bruises were three to four days old.

at the foster home. Jane picked up Christa, who cried because of the pain. The foster mother testified James then said to Christa: "It really doesn't hurt, and you know it. What's your problem?" At a detention hearing on January 9, 1985, the juvenile court ordered Christa to be detained in Jane's home after verification that James was out of the home. There was to be no contact between James and Christa and there was to be no corporal punishment of the minor by the mother.[5] On February 28, 1985, the juvenile court made a true finding under Welfare and Institutions Code section 300, subdivision (a). The minor was to be placed in the home and both Jane and James were to participate in counseling.

### B. *The March 30, 1985, Incident*

On March 30, 1985, James phoned for emergency aid saying his girl was dying. Firemen arrived and found Christa lying on the floor of her bedroom and not breathing. They applied mouth-to-mouth resuscitation and chest compressions until the paramedics arrived and took charge. Upon her arrival at Sharp Hospital, Christa was found lifeless and unresponsive to any stimuli. Various resuscitation efforts were unsuccessful. Christa was pronounced dead within a half-hour.

An internal examination showed about 300 cubic centimeters of semi-coagulated blood in the abdominal cavity. The source of bleeding was a tear in the superior mesentric artery, which supplies blood to the structures in the abdomen and pancreas, and a rupture of the pancreas. A forensic pathologist attributed death to bleeding caused by the ruptured pancreas and the superior mesentric artery. He opined the injury could have been caused by a blunt force, such as a hard punch or kick. Another doctor testified considerable force was necessary to cause the abdominal injuries, explaining this type of injury was often seen when automobiles strike children. During the autopsy, the pathologist found numerous bruises on the forehead, face, arms, legs, abdomen and back. The pathologist opined all of these bruises, except for the one on the forehead, appeared to be less than 12 hours old. X-rays showed an injury to the pelvis (ischial bone), which the radiologist opined was two to four weeks old, as well as an injury to the ribs (separation of the costa chondral cartilage). The radiologist opined the rib injury was two to three weeks old. A blood alcohol level of .02 percent was found. The director of the regional poison center opined the only effect of the alcohol would have been a little drowsiness and perhaps some difficulty walking.

---

[5] On January 10, 1985, a Department of Social Services social worker returned Christa to her mother pursuant to the court order and a notification by the Australian Embassy to the juvenile court that Christa should be returned immediately. Jane had phoned the Australian Embassy.

Christa's stomach contained some cigarette fibers. Ingestion of the cigarettes promoted vomiting.

With regard to Christa's fatal injuries, James was interviewed by the police and told them Christa had ingested some 151 proof rum and some cigarettes and complained about "a pain in my tummy . . . ." James said he tried to induce vomiting by (1) putting his finger down her throat and (2) bending her over and hitting her in the back. James said he also placed Christa in the shower and ran cold water on her. He said she slipped in the shower. After removing her from the shower, she complained she was cold and he wrapped two blankets around her. He said he pushed in her stomach and "this black stuff came out . . . ." James said he hit and spanked Christa in addition to pushing her stomach so she would not go to sleep.[6]

The various prosecution expert witnesses testified Christa's injuries were nonaccidental and they did not believe any of the injuries could have been caused by resuscitation efforts. Two pediatrics and child abuse experts opined that Christa was a victim of the battered child syndrome.

### C. *Observations of Lay Witnesses*

Rickey Brown knew James for seven to nine years and was frequently at James's apartment. Brown and James used cocaine together and often went to card rooms where they played poker. Brown testified that a couple of times during dinner James sent Christa to her room and spanked her. Brown testified James said it did no good to "whup" Christa because she does not care and would do the same thing over and over. Brown testified that on one occasion he, James and Christa were in the car and Christa was fidgeting. Brown said James told Christa to sit up and swatted her with the back of his hand on her chest and stomach. Brown said the contact sounded like a thump and that if he had been hit that hard, he felt it would have knocked the breath out of him. During another ride in the car, Brown testified James seemed to be upset and said, "Bitch, jump out the window." Christa got up and reached for the window, but Brown stopped her. On another occasion, Christa was in the car waiting for Brown and James. When James got into the car, he noticed Christa had urinated on the seat. Brown testified that James put Christa on the floorboard of the car, put her face in the urine and told her to lick the urine on the seat.

The apartment manager testified about an incident in which Christa appeared frightened of James. The manager said James told her, "She acts

---

[6] A tape recording of the police interview was played for the jury and a transcript of the interview was provided.

that way because maybe sometimes I discipline her too hard or spank her too hard." The manager said she saw bruises on Christa each month from November 1984 through March 1985. On March 10, 1985, the manager testified she heard James and Jane arguing. The manager heard Jane say, "I said don't touch her again," and James say, "I'm tired of this shitting mess."[7]

Lucious Dillard testified James told him Christa did things to get on his nerves. At one point James told Dillard, "The bitch has to leave, or I have to leave," referring to Christa.

Nikia (Mimi) Griffin was a seven-year-old friend of Christa. In February, after Christa's leg cast was removed, Nikia slept in the James's apartment one night. The next morning, Nikia testified, James came into Christa's bedroom with a belt and his fist "balled up." James told Nikia to leave the room. Nikia heard Christa crying, the bed "fall down" and a noise like a "swish of the wind." Nikia went outside. Through the kitchen window, Nikia saw James put Christa in the corner of the living room, where she stayed for about an hour. Later, Nikia saw James hit Christa in Christa's bedroom.

Cecilia Griffin, Nikia's mother, testified that at her daughter's birthday party James popped Christa's balloons and grinned while Christa cried. Cecilia Griffin testified James often would tell Christa he was going to pinch her or make little threats in a joking manner. Christa often would cry. Cecilia Griffin testified James would say to Christa, "I'm going to break your little neck."

Testimony also was received about the following injuries that were observed on Christa after her arrival in the United States: (1) in October 1984, a black eye and cut above the eye (Jane testified that Christa hit the corner of a dresser while playing); (2) in November 1984, a second black eye (Jane testified Christa tripped over James's legs into a coffee table); (3) in December 1984, a teacher's aide at the Naval Training Center's day-care center noticed a bruise on the right side of Christa's jaw and light bruises on her hands; (4) in February 1985, a babysitter noticed black and blue bruises on Christa's cheeks and a bump on her head; (5) on February 25, 1985, employees of the Naval Training Center's day-care center noticed bruises on Christa's hands and later that week Christa had a bruise on her forehead; (6) the following week, Christa's wrist was badly swollen, she had a large bloody scab in the middle of her head and a bruise across her forehead; (7)

---

[7]Jane testified she said, "Don't touch her." At the time, Christa was making a mess with the toothpaste while brushing her teeth. Jane testified that James did not say anything. Jane testified *she* herself said, "I am sick of this mess."

the next week, the day-care teacher noticed four gashes about three-fourths of an inch long on Christa's head and some bruises below her waist; and (8) in late March 1985, the baby-sitter noticed some bruises and scratches on Christa's cheek.

### D. *Defense Evidence*

Jane and James testified Christa bruised easily. On January 3, 1985, James testified Christa whined, but did not cry when Jane went to the store without her. To cheer her up, James grabbed Christa by the ankle and began to swing her up—as he often did—when something in Christa's leg gave.

James testified that on March 30, 1985, he drove Jane to work around 2 p.m. James did a "chip" of cocaine and left a glass with rum in it on the coffee table. Later, James observed Christa wobble and fall. James said when he picked Christa up, he smelled alcohol on her breath. When Christa began dozing off, James put her in the bathtub and showered her with water. Christa slipped and fell in the bathtub. Later, when Christa started falling asleep again, he repeated the shower procedure. Then he decided to try to get the alcohol out of her. He stuck his finger down her throat and she bit his finger. Later he picked Christa up, got down on his knees and with Christa's back towards him, he put his arm on her stomach and squeezed her against him in an effort to get her to vomit. Next, he bent Christa over his arm and hit her on the back. When he pressed her on her stomach, some brown material came out of Christa's mouth. James called Jane at work. Brown material came out of Christa's mouth when he pressed on her back as she laid on her stomach. When James picked Christa up, put her over his shoulder and hit her back, more brown material came out. When Christa's eyes went "starey," James decided to call paramedics.

A licensed clinical psychologist met in January with Jane and Christa twice and later with James. Christa told him James was giving her an airplane ride when her leg popped. Christa appeared very fond of James. The psychologist also testified that through March 27, when he last saw James and Christa, he did not believe there was abuse. A forensic pathologist, who reviewed James's account of his pressing the abdominal area of the child, testified he believed this pressure could have caused Christa's injury. He opined Christa's bruises were consistent with James's account of his resuscitation techniques. He could not rule out the conclusion the fatal injury was accidentally caused. He also opined that statements regarding James's playing airplane with Christa were not inconsistent with her broken leg.

An expert on hematology testified Jane had a mild form of Von Willebrand's disease, which would include an increased tendency to have bruises.

Because the disease is hereditary, Christa had a 50 percent chance of having the disease.

DISCUSSION

I

■■,■■ James contends the trial court committed prejudicial error by failing to instruct on accomplices with regard to Jane. ■■ The law is clear: An accomplice is one who is liable for prosecution for the identical offense charged against the defendant. (§ 1111; *People v. Gordon* (1973) 10 Cal.3d 460, 468 [110 Cal.Rptr. 906, 516 P.2d 298].) ■■ When the evidence establishes by a preponderance of the evidence that a person is an accomplice, the court must instruct sua sponte on accomplices. (*People v. Gordon, supra,* 10 Cal.3d at pp. 468-469; *People v. Martinez* (1982) 132 Cal.App.3d 119, 130 [183 Cal.Rptr. 256]; *People v. Boyce* (1980) 110 Cal.App.3d 726, 738 [168 Cal.Rptr. 219].)

■■,■■ Under the facts of this case, it is clear that Jane was an accomplice to count II, a violation of section 273a, subdivision (1). Section 273a, subdivision (1) provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years." Even if we disregard the occasions on which Jane struck Christa, she would be liable under section 273a, subdivision (1) because there is sufficient evidence she failed to protect Christa knowing James was abusing the child. She had the care and custody of Christa and permitted the child to be injured or placed in a dangerous situation. Similar reasoning arguably would also support an implied malice finding (see, e.g., *People v. Watson* (1981) 30 Cal.3d 290, 296-297 [179 Cal.Rptr. 43, 637 P.2d 279]), making Jane an accomplice to the murder charge in count I as well.

■■ In any event, it is clear the jury should have been instructed on accomplices. ■■ The key question is whether the failure to so instruct *requires reversal.* The appropriate instructions would have (1) defined an accomplice under section 1111, (2) stated the necessity for corroboration of the testimony of an accomplice, (3) explained the nature of corroboration, and (4) declared that an accomplice's testimony must be viewed with distrust. (CALJIC Nos. 3.10, 3.11, 3.12, 3.16, and 3.18.) James complains that

the failure to give CALJIC No. 3.18 ("The testimony of an accomplice ought to be viewed with distrust") was prejudicial.[8] He contends most of Jane's testimony was damaging. He also contends Jane's testimony was significant on the issues of (1) whether he abused Christa on or before March 30, 1985, and (2) whether his testimony on the events of that day was consistent.

■ The standard for reversal on this issue is whether the failure to instruct resulted in a miscarriage of justice requiring a reversal. (Cal. Const., art. VI, § 13; *People* v. *Gordon, supra,* 10 Cal.3d 460.) "It is well established that ' "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People* v. *Gordon, supra,* 10 Cal.3d at p. 470, quoting from *People* v. *Bevins* (1960) 54 Cal.2d 71, 78 [4 Cal.Rptr. 504, 351 P.2d 776], quoting from *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) ■ No cases have held failure to instruct on the law of accomplices to be reversible error per se. ■ ■ The leading authority, *People* v. *Gordon, supra,* describes our duty in this manner: " '[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice, it is the duty of the trial court to instruct the jury upon the law as set forth in section 1111 of the Penal Code; that the failure of the trial court to so instruct the jury under such circumstances, with or without a specific request for such instructions, constitutes error; but that in the event of such failure in any case, the entire record must be considered in determining whether such error constituted prejudicial error requiring a reversal of the judgment of conviction.' " (*Id.* at p. 470-471, quoting from *People* v. *Warren* (1940) 16 Cal.2d 103, 118-119 [104 P.2d 1024], overruled on other grounds in *People* v. *Cook* (1983) 33 Cal.3d 400, 413, fn. 13 [189 Cal.Rptr. 159, 658 P.2d 86].)

■ Although much of Jane's testimony was favorable to James, some was damaging. He argues the following parts of her testimony were most damaging: (1) the absence of bruises on Christa before Jane left for work on March 30; (2) Christa's disinclination to ingest rum or cigarettes; and (3) James's propensity to call her at work when any little thing went wrong. James argues that the jury's determination that Christa's death was not accidental depended strongly on Jane's testimony.

However, the evidence against James is clearly substantial without Jane's testimony. James was home alone with Christa when the fatal injuries

---

[8] James is not raising the issue of the need for an instruction on corroboration.

occurred. Before that, James was observed acting in a cruel manner toward Christa by several people. James's explanations of Christa's injuries were inconsistent with the medical examinations and the opinions of various medical experts. We conclude it is not reasonably probable that had the jury been given the instructions on accomplices it would have reached a result more favorable to James.

## II

■ James contends the trial court erred by failing to instruct under CALJIC No. 2.71.7, which states: "Evidence has been received from which you may find that an oral statement of [intent] [plan] [motive] [design] was made by the defendant before the offense with which he is charged was committed. [¶] It is your duty to decide whether such a statement was made by the defendant. [¶] Evidence of an oral statement ought to be viewed with caution."

The trial court, however, did instruct under CALJIC No. 2.71, which states: "An admission is a statement made by defendant other than at his trial which does not by itself acknowledge his guilt of the crime(s) for which he is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. If you should find the defendant did not make the statement, you must reject it. If you find it is true in whole or in part, you may consider that part which you find to be true. [¶] Evidence of an oral admission of the defendant should be viewed with caution."

James argues that various statements attributed to him by Brown, Dillard, Cecilia Griffin, Nikia Griffin, the apartment manager and the foster mother were preoffense statements and *not* admissions. Therefore, he concludes, CALJIC No. 2.71 was not sufficient to alert the jury that evidence of these statements by James ought to be viewed with caution. We disagree. James is making a distinction without a difference.

He is correct that the testimony given by Brown, Dillard, the Griffins, the apartment manager and the foster mother included preoffense statements by James that required cautionary instructions under California law. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892].) However, as this court noted in *People* v. *Lopez* (1975) 47 Cal.App.3d 8, 12 [120 Cal.Rptr. 562]: "In requiring cautionary instructions . . . , the courts of this state have not distinguished between actual admissions and damaging pre-offense statements of the accused relating to the crime [citations]." (See

also *People* v. *Beagle, supra,* 6 Cal.3d at p. 455, fn. 5; *People* v. *Ford, supra,* 60 Cal.2d at pp. 799-800.) We are not inclined to do so in this case now.

The instruction given (CALJIC No. 2.71) alerted the jury to the necessity to use caution in evaluating preoffense statements by James. We find the cautionary instruction given in CALJIC No. 2.71 was adequate to advise the jury to use caution in receiving the statements. (See *People* v. *Kozel* (1982) 133 Cal.App.3d 507, 529-530 [184 Cal.Rptr. 208].) The omission of CALJIC No. 2.71.7 was harmless in this case.[9]

## III

James contends the trial court improperly admitted hearsay statements made by Christa about how she sustained her broken leg. A social worker for the Department of Social Services was allowed to testify Christa told him, "My daddy twisted my ankle and hurt me." A pediatric nurse was allowed to testify (1) Christa said James became angry at her for crying and twisted her ankle until it broke, and (2) Christa said, "I wasn't even naughty and my feet were stepped on hard." A licensed vocational nurse was allowed to testify Christa said she was crying when her mother went to the store and James twisted her leg.[10]

We agree that most if not all of the challenged statements constituted inadmissible hearsay. We cannot conclude, however, that it is reasonably probable a result more favorable to James would have been reached in the absence of the error. (See *People* v. *Watson, supra,* 46 Cal.2d 818, 836.) Four different doctors testified that the injury to Christa's ankle was nonaccidental and could not have occurred in the manner described by James. Dr. Chadwick based his diagnosis in part on Christa's statements relating the cause of the injury. Thus, to that extent, Christa's statements would have been properly communicated to the jury in any event. (See *People* v. *Wilson* (1944) 25 Cal.2d 341, 348 [153 P.2d 720].) Accordingly, reversal is not required.

---

[9] Moreover, the state of the evidence in this case made the omission of CALJIC No. 2.71.7 even less significant. James testified he (1) did not recall breaking Christa's balloons at the party, (2) did not make Christa lick urine from the car seat and (3) did not tell the apartment manager he disciplined Christa too hard and explained the statement overheard by the manager about his being tired of the mess. James also testified he did not recall asking Christa to jump out the car window and denied telling Christa he was going to break her neck or saying that either Christa had to leave or he did.

[10] At trial, James did not object to the vocational nurse's testimony. James is therefore precluded from raising the objection on appeal. (*People* v. *Brown* (1969) 272 Cal.App.2d 623, 629 [77 Cal.Rptr. 650].)

## IV

 The prosecution sought a first degree murder conviction by resort to the torture-murder theory. Section 189 makes a murder which is perpetrated by means of torture a murder of the first degree. In *People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206], our Supreme Court held, "[M]urder by means of torture under section 189 is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." The prosecution need not establish that the defendant intended to kill the victim. Nonetheless, the torture-murder theory of first degree murder does not come into play until it is established that the defendant is guilty of murder, i.e., a killing with malice. (§ 187.) Thus, the prosecution must at a minimum demonstrate that the victim's death resulted from defendant's "intentional act involving a high degree of probability of death which [was] committed with conscious disregard for human life." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861].)

 James first attacks the malice prong of the prosecution's case, arguing the jury was erroneously instructed on this essential concept. He then argues that the evidence is insufficient to establish that any murder which occurred was committed by means of torture.

### A.

*Malice Instructions*

 James contends that the definition of malice in the jury instructions was vague and precluded the jury from distinguishing murder from manslaughter.

The jury here was instructed pursuant to CALJIC No. 8.11[11] as to the definition of malice: "'Malice' may be either express or implied.

"Malice is express when there is manifested an intention unlawfully to kill a human being.

"Malice is implied when the killing results from an intentional act involving a high degree of probability it will result in death, and the act is done for a base, anti-social purpose and with a wanton disregard for human life or when the killing results from an intentional act, the natural consequences of

---

[11] The jury instruction given here has minor grammatical differences from CALJIC No. 8.11.

which are dangerous to life, and the act was deliberately performed by a person who knows his conduct endangers the life of another and who acts with conscious disregard for life.

"When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

"The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

" 'Aforethought' does not imply deliberation or the lapse of considerable time. It only means the required mental state must precede rather than follow the act."

As to express malice, James argues the concept is vague because it is defined in terms of intent to kill. He points out that voluntary manslaughter, as well as murder, involves an intentional killing.[12] Therefore, he concludes, the definition of express malice is insufficient to distinguish a murder with express malice from voluntary manslaughter. But assuming we agree with James that CALJIC No. 8.11 fails to adequately distinguish murder from voluntary manslaughter, he does not explain how any reasonable jury could view these facts to establish that he was guilty of voluntary manslaughter. Thus, if the jury found he intended to kill, it necessarily and properly concluded the killing was murder. Any instructional error could not possibly have prejudiced James.

 With regard to defining implied malice, the jury instruction is cast in language that provides two alternatives. James argues the first alternative fails to require a finding the defendant was subjectively aware of the significant risk of death he was creating, which could have led the jury to convict him on an implied theory without a subjective awareness.[13]

---

[12]CALJIC No. 8.40 defines voluntary manslaughter as "the unlawful killing of a human being without malice aforethought when there is an intent to kill." The jury here was so instructed.

[13]James also argues that legislative amendments to Penal Code section 188 in 1981 and 1982 obfuscated the definition of malice and inadvertently obliterated the distinction between implied malice murder and involuntary manslaughter. This argument suggests the "subjective awareness" requirement has been eliminated. We disagree. As a result of the amendments, the second paragraph of section 188 now reads: "When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice." This language constituted a legislative response to a series of Supreme Court decisions which developed a "diminished capacity" defense by interpreting the arcane phrase "abandoned and ma-

It appears that in an attempt to track the language of *People* v. *Watson, supra*, 30 Cal.3d 290, the jury instruction was erroneously cast in disjunctive language. In *Watson*, the Supreme Court restated the rule that the malice aforethought necessary for a second degree murder conviction may be implicit and clarified the requirement that a defendant understand the life-threatening quality of his act: "We have said that second degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " . . .' [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" (*Id.* at p. 300.) "Phrased in a different way" suggests there is one definition of implied malice being offered. In CALJIC No. 8.11, however, the word "or" is substituted for the language "phrased in a different way." ▮ This unfortunate substitution leads to the implication that there are different tests for implied malice, the first of which does not require such knowledge. This interpretation is wrong, for as the *Watson* court stated: "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Id.* at pp. 296-297, original italics.)

▮ It is clear that at the very least CALJIC No. 8.11 is confusing on this point. Assuming arguendo that we accept James's argument that CALJIC No. 8.11 is erroneous, we still must decide whether the error was prejudicial to James on the facts of this case.

Here, significantly, the prosecutor's argument to the jury addressed the definition of implied malice: "Now implied malice—you have implied malice when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [¶] As you have learned, there is no ill will or hatred of the person who is killed that is required. [¶] *There are two different definitions that are given of implied malice that are similar, especially as they relate to the facts in this case*. The one that I just read to you was the one on the bottom. Let's take a look at

---

lignant heart" which appears in section 188 to include, among other things, a requirement that the defendant was aware "of [a] duty to act within the law" and that he was able "to act in accordance with that duty." (See *People* v. *Poddar* (1974) 10 Cal.3d 750, 758 [111 Cal.Rptr. 910, 518 P.2d 342], and cases there cited.) The fact that the Legislature has seen fit to eliminate the requirement that a defendant be aware of and able to comply with general social obligations in no way indicates that implied malice may be found without proof that the defendant was subjectively aware of the specific risks he was creating.

the one at the top. [¶] Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life.

"You will be receiving that instruction and you will have it available to you in your jury room. [¶] Therefore, if you determine that Christa [H.'s] death was unlawful and done with implied malice, then the elements of murder are met. [¶] And the implied malice can be found if you determine that the blunt force which ruptured Christa's pancreas and superior mesenteric artery was deliberately caused by the defendant who knew that his conduct endangered her life, *and he acted with conscious disregard for her life.*" (Italics added.) Here, the prosecutor corrected any misleading implication in CALJIC No. 8.11 by emphasizing that the jury had to find James acted with conscious disregard for Christa's life.

Also, it is significant this is not a close case. It involved the application of such force to a three-year-old girl's abdominal area that her pancreas was ruptured. Doctors testified such an injury most frequently occurs where an automobile runs over a child. This was not a situation in which the jury reasonably could conclude that James, a former football player who weighed more than 200 pounds, did not act with subjective awareness of the risk of death he was creating when he applied this force to a girl who weighed 30 pounds and was 38 inches tall. Under the facts of this case, it was thus irrelevant that CALJIC No. 8.11 may have improperly suggested that a finding of subjective awareness was unnecessary. Any error was harmless beyond a reasonable doubt. (See *Rose* v. *Clark* (1986) 478 U.S. 570, 573-584 [92 L.Ed.2d 460, 467-475, 106 S.Ct. 3101, 3103-3109].)

## B.

### *Evidence of Torture*

As previously noted, a conviction of first degree murder on a torture-murder theory requires that the People establish the defendant harbored "a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain" and that the murder resulted from the infliction of such torture. (See *People* v. *Steger, supra,* 16 Cal.3d at p. 546.) "It is thus apparent that the *intent* to inflict torturous pain and suffering on the victim is at the heart of the crime of first degree murder perpetrated by torture." (*People* v. *Davenport, supra,* 41 Cal.3d at p. 268, italics added.) Hence, it is clear that "[t]he test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death." (*People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51].) Whether a defendant had a

willful, deliberate and premeditated intent to inflict extreme and prolonged pain may be inferred from the circumstances surrounding the killing. (*People* v. *Steger,. supra,* 16 Cal.3d at p. 546.)

■ James argues that evidence of intent to inflict extreme and prolonged pain was insufficient. He also argues the fact he may have abused Christa before the fatal incident is not sufficient to show the intent to torture. He relies upon *People* v. *Steger, supra,* 16 Cal.3d 539 and *People* v. *Walkey* (1986) 177 Cal.App.3d 268 [223 Cal.Rptr. 132].

In *Steger, supra,* the three-year-old victim died from severe injuries inflicted by her stepmother over a one-month period. The injuries included a hemorrhaged liver, adrenal gland, intestines and diaphragm; a lacerated chin; a fractured left cheekbone and right forearm, as well as cuts and bruises from head to toe. The Supreme Court held the first-degree murder conviction on a torture-murder theory was not supported by substantial evidence and it was error for the court to instruct on murder by torture. (*Id.* at pp. 548-549.) In particular, the Supreme Court found that the People's evidence painted the stepmother "as a tormented woman, continually frustrated by her inability to control her stepchild's behavior." (*Id.* at p. 548.) The court concluded, "The beatings were a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a criminal sense wilful, deliberate, or premeditated." (*Ibid.*)

In *Walkey,* this court concluded the evidence was insufficient to support a torture-murder conviction of the defendant for the fatal beating he administered on the two-year-old child he was supervising. We found the record indicated the defendant in *Walkey* may have become frustrated and angry with the child and intended to punish him but dispelled any hypothesis that defendant's primary purpose was to cause the child to suffer. (*People* v. *Walkey, supra,* 177 Cal.App.3d at p. 276.) We observed, "Such explosive violence on the part of the abusing adult, without more, does not support a torture murder theory." (*Ibid.*)

In *Steger,* the Supreme Court discussed at length the previous opinions dealing with torture murder and observed a constant theme in all[14] of the

---

[14] The court noted one possible exception: *People* v. *Gilliam* (1952) 39 Cal.2d 235 [246 P.2d 31], in which "defendant, for no reason at all, beat and trampled to death a fellow prison inmate he had just met. It is arguable whether he had a calculated intent to inflict extreme pain on his victim or whether his attack was the type of explosion of violence born of 'hot anger' and 'animal fury' which the court in *People* v. *Tubby* classified as second degree murder. (34 Cal.2d at pp. 77-78.) The majority, upholding a torture murder conviction, emphasized that defendant gouged out his victim's eye and that the sadistic episode consumed considerable time. Justice Carter dissented on the basis of *Tubby*." (*People* v. *Steger, supra,* 16 Cal.3d at p. 547, fn. 3.)

affirmances: the willful, deliberate and premeditated infliction of pain. (See also *People* v. *Daugherty* (1953) 40 Cal.2d 876 [256 P.2d 911], overruled on other grounds in *People* v. *Cook* (1983) 33 Cal.3d 400, 413 [189 Cal.Rptr. 159, 658 P.2d 86], fn. 13.) The court also noted a distinct theme in those cases that were reversed: the lack of calculation evidenced by the defendant acting in a fit of anger (*People* v. *Bender* (1945) 27 Cal.2d 164, 177 [163 P.2d 8]) or displaying an act of animal fury (*People* v. *Tubby, supra,* 34 Cal.2d at p. 78) or displaying an explosion of violence without the necessary intent that the victim shall suffer (*People* v. *Anderson* (1965) 63 Cal.2d 351, 360 [46 Cal.Rptr. 763, 406 P.2d 43]).

In *Steger, supra,* and *Walkey, supra,* torture-murder convictions were reduced to second degree murder convictions because the reviewing court found the defendants did not have the requisite calculated intent to inflict pain and suffering. The beatings they inflicted upon their young child victims were misguided—to say the least—disciplinary attempts sparked by explosions of violence. The same cannot be said of James here. Therefore, his reliance on *Steger* and *Walkey* is misplaced.

Moreover, *Steger* and *Walkey* do not stand for the proposition that a beating death of a child cannot be a torture murder. As the *Steger* court noted: "[W]e do not imply, of course, that a murder of a child can never be torture murder. In appropriate circumstances a child batterer can be found to be a torturer." (16 Cal.3d at p. 549.) Here, having reviewed the entire record in the light most favorable to the judgment as we must (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), we conclude substantial evidence supports the finding that James had the requisite willful, deliberate and premeditated intent to inflict extreme and prolonged pain on Christa. Unlike the defendants in *Steger* and *Walkey,* James's various acts of cruelty toward Christa were not for the most part disciplinary in nature, nor done in explosive fits. On the contrary, when James abused Christa—both physically and emotionally—he was often cool and calm. Starting with bruises in October 1984 and continuing with a broken leg in January 1985 and up to her fatal injuries on March 30, 1985, Christa was, to all ostensible purposes, James's punching bag. While a few of the physical injury incidents might be characterized as discipline-related, other evidence amply demonstrated James's sadistic nature. Telling Christa to jump out the window of a moving automobile and deliberately popping her balloon at a party can in no sense be characterized as even "misguided" attempts at discipline. (See *Steger, supra,* 16 Cal.3d at p. 548.) Particularly significant in this regard was the testimony indicating that James forced Christa to lick urine off the seat of the car.

But we need not rely solely on evidence of James's sadism derived from events prior to the fatal injuries of March 30, 1985. The evidence of the

events immediately preceding Christa's death also supports the jury's conclusion that James intended Christa to suffer extreme pain. James did not phone his wife for advice on Christa's condition until 5 p.m., even though he had not hesitated in the past to phone Jane at work. He did not seek paramedic assistance until Christa was beyond the point she could be saved. In the opinion of the pathologist, Christa's fatal injuries would not have caused death until at least an hour had passed.

The death-causing injuries were undeniably severe[15] but, consistent with the principles of *Steger* and *Walkey,* this of itself would not support the torture-murder theory. (See *People* v. *Campbell* (1987) 193 Cal.App.3d 1653, 1669 [239 Cal.Rptr. 214].) Here, however, the evidence demonstrated that at some point on the afternoon of March 30 Christa ingested quantities of 151 proof rum and cigarettes. The totality of circumstances appropriately convinced the jury that this ingestion was not voluntary; rather, she was forced to consume them by James. It is frankly impossible to reconcile this fact with a conclusion that Christa's fatal injuries were the product of an irrational "explosion of violence." (See *People* v. *Anderson, supra,* 63 Cal.2d at p. 360.) The record here contains more than substantial evidence from which a rational trier of fact could have found, beyond a reasonable doubt, James was guilty of torture murder in Christa's death. (See *People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468], overruled on other grounds in *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99].)

V

 James combines his first three arguments with four additional contentions of error and argues that the cumulative effect of all these errors denied him a fair trial and requires a reversal.

The additional contentions of error include (1) improper introduction of documents and evidence under the business records exception to the hearsay rule, (2) improper jury instruction on misleading statements and consciousness of guilt (CALJIC No. 2.03), (3) improper jury instruction (CALJIC No. 2.62) and failure of the trial court to inquire what evidence the instruction related to, and (4) improper jury instruction on murder by torture.

---

[15] In addition to the tear in the superior mesenteric artery and the ruptured pancreas, the autopsy showed hemorrhages around the adrenal glands, the upper portion of the kidneys and part of the small bowel, and bruises less than 12 hours old on Christa's forehead, face, arms, legs, abdomen and back.

## A. *Business Records*

 James contends five exhibits—People's exhibits 6, 18,[16] 40, 41 and 59—were improperly admitted. James concedes his trial counsel did not object to the introduction of exhibit 6. He, therefore, is precluded from raising it on appeal. (*People* v. *Utter* (1972) 24 Cal.App.3d 535, 552-553 [101 Cal.Rptr. 214].) James's hearsay objections to exhibit 41 (Children's Hospital records) and exhibit 59 (entries by a Department of Social Services social worker) deal with statements purportedly made by Christa. As discussed in section III of this opinion, the erroneous admission of Christa's statements did not unduly prejudice James. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

## B. *CALJIC No. 2.03*

Over the objection of James's counsel, the jury was instructed pursuant to CALJIC No. 2.03: "If you find that before this trial the defendant made wilfully false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

James contends there was no evidence to support the giving of this instruction since his statements to police were consistent with his trial testimony. The People counter with discrepancies between the pretrial statement to the police and James's trial testimony on how Christa sustained an injury to her mouth and on whether he watched a certain television program—an issue that related to how long it took James to call for emergency aid for Christa. GP8

It is unclear whether James's original statements or his later testimony on these points was false. But even assuming arguendo there was instructional error, in light of all the evidence, James was not prejudiced by this instruction. We are convinced the deletion of CALJIC No. 2.03 from the jury instructions would not have resulted in a result more favorable to James. (*People* v. *Louis* (1984) 159 Cal.App.3d 156, 162 [205 Cal.Rptr. 306].)

---

[16] James does not indicate what portions of exhibits 18 and 40 he objects to as inadmissible hearsay. Exhibit 18 consists of Balboa Naval Hospital records and exhibit 40 consists of records from Sharp Hospital.

## C. *CALJIC No. 2.62*

■■■■ The trial court's instruction to the jury per CALJIC No. 2.62[17] is claimed to be error. James contends that telling the jury an adverse inference could be drawn if it found that he failed to explain or deny facts which he could reasonably be expected to explain or deny was error because there were no facts in the People's case James failed to explain. We agree.

It is error to give this instruction in the absence of evidence in the People's case which is within the defendant's particular knowledge to explain and to which no explanation is offered. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 683 [156 Cal.Rptr. 871, 597 P.2d 130].) As James points out, he explained virtually all of the evidence against him that was within his particular knowledge. We are not persuaded by the People's argument that James's testimony in which he failed to recall two statements attributed to him justified the giving of the instruction on the basis that the jury could have found James's loss of memory was feigned. (Compare *People* v. *Kozel, supra,* 133 Cal.App.3d 507, 531.)

The error, however, is harmless. There is no question but that James intentionally caused Christa's death given the overwhelming expert medical testimony rejecting the possibility of an accidental cause. And as we have already explained, if we assume James caused the death, the circumstances of the killing are incompatible with an unplanned "explosion of violence" hypothesis. Accordingly, there is no reasonable probability of a different result in the absence of the error. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836; *People* v. *Marsh* (1985) 175 Cal.App.3d 987, 994 [221 Cal.Rptr. 311].)

---

[17] CALJIC No. 2.62 (1979 revision): "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of his attorney. In this case defendant has elected to and has testified as to certain matters. [¶] If you find that he failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable. [¶] In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence. [¶] The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt."

In the instant case the court deleted the first two sentences of CALJIC No. 2.62 and made minor grammatical changes.

## D. *Torture Instruction*

 James contends the jury was improperly instructed on murder by torture. Pursuant to CALJIC No. 8.24, the jury was instructed as follows: "Murder which is perpetrated by torture is murder of the first degree.

"The essential elements of such a murder are that the defendant must commit such act or acts with the *intent to cause cruel pain and suffering* for the purpose of revenge, extortion, persuasion or for any sadistic purpose.

"The crime of murder by torture does not necessarily require any proof the defendant intended to kill the deceased, nor does it necessarily require any proof the deceased suffered pain." (Italics added.)

James claims the jury instruction is erroneous because murder by torture requires the wilful, deliberate and premeditated *intent to inflict extreme and prolonged pain*. This is a correct statement of law. (See *People* v. *Steger, supra,* 16 Cal.3d at p. 546.) Nonetheless, although the phrases "cruel pain and suffering" and "extreme and prolonged pain" are not identical, they are very similar. The phrases frequently have been used interchangeably in the decisional law of this state. For example, in *People* v. *Tubby, supra,* 34 Cal.2d at p. 77, the Supreme Court discussed the definition of murder by torture by observing: " 'Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death.' " More recently, in *People* v. *Davenport, supra,* 41 Cal.3d 247, 267, quoting *People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881], the Supreme Court relied indirectly on CALJIC No. 8.24 to observe that one of two elements of murder by torture is: " ' " [T]he defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose." ' "

Moreover, in *People* v. *Talamantez* (1985) 169 Cal.App.3d 443, 455 [215 Cal.Rptr. 542], this court specifically approved CALJIC No. 8.24: "The jury here was instructed specifically to determine whether Talamantez committed acts 'with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, or persuasion or for any sadistic purpose.' This is a precise and correct statement of the law." In another section of the *Talamantez* opinion, this court went on to say that "cruel" as it modifies "pain" means "extreme" or "severe." (*Id.* at p. 457.) Hence, the phrase "cruel pain and suffering" encompasses the same meaning as the phrase "extreme and prolonged pain" with the possible exception of the concept of time connoted

in the word "prolonged." If there is any distinction, it is de minimis in this case.

Even assuming arguendo it was error not to instruct the jury using the phrase "prolonged pain," James was not prejudiced. Christa's injuries, according to the medical testimony, were inflicted over an extended period of time and were quite painful. Her fatal injuries did not cause instant death, but took approximately 20 minutes to render her unconscious—20 minutes in which she undoubtedly suffered extreme pain. Had the jury been instructed with the phrase "prolonged pain," it is not reasonably probable a result more favorable to James would have been reached. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

### E. *Cumulative Effect*

Finally, James asserts that the cumulative effect of the errors he alleges requires reversal and remand for a new trial. (See generally *People* v. *Holt* (1984) 37 Cal.3d 436, 458-459 [208 Cal.Rptr. 547, 690 P.2d 1207].) Obviously to the extent we have concluded James's contentions do not establish error, there is no cumulative effect to consider. We have reviewed those arguments in which we have found error and conclude they do not fortify one another such that we are concerned there has been a miscarriage of justice. (Cal. Const., art. VI, § 13.) We are also satisfied beyond a reasonable doubt that the totality of error we have analyzed did not contribute to the guilty veredict. (*People* v. *Williams* (1971) 22 Cal.App.3d 34, 58 [99 Cal.Rptr. 103].)

### DISPOSITION

Judgment affirmed.

Wiener, Acting P. J., and Butler, J., concurred.

A petition for a rehearing was denied December 8, 1987, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 24, 1988.