*397 Opinion
BOREN, J.
Following a jury trial, Miguel Frazio Perez was convicted of second degree murder. (Pen. Code, § 187, subd. (a).) He contends: (1) that the court erred in instructing the jury during deadlocked deliberations that they should not “consider” lesser offenses before acquitting on the second degree murder count, (2) that the implied malice instruction was unclear and confusing, and (3) that the court unduly pressured dissenting jurors to acquiesce in the verdict when it stated, in response to a juror’s inquiry, that the jurors could change the jury foreman as long as the “palace coup” was “bloodless.” We affirm.
Facts
On August 15, 1987, at approximately 8 p.m., appellant drove his Datsun through a red light on Martin Luther King Boulevard and was unable to stop when traffic exiting the Harbor Freeway entered the intersection on a green light. Appellant’s car crashed into the fender of a Volkswagen Rabbit driven by Dianna McDonald. McDonald’s companion, Lamarque Williams, got out of the passenger seat of the car and gestured for appellant to pull over to the side of the road so they could exchange information. Appellant nodded his head in apparent compliance, backed his car up, pulled over, went around McDonald’s car, but then drove off.
A passerby, Renee Sanders, observed the incident and pursued appellant’s Datsun in her own car, a brown Célica, in an effort to obtain appellant’s license plate number. Even after Sanders observed that appellant’s car had no license plate, she continued to follow his car. Appellant turned onto Broadway, sped through a residential neighborhood, ran a stop sign on Broadway Place and went through a red light on Main Street. Appellant made numerous turns and drove down the wrong side of the street, barely avoiding three oncoming cars.
At one point, Sanders got in front of appellant’s car and slowed down in an attempt to get him to stop. When appellant failed to slow down and Sanders tried to get out of the way, appellant’s car sideswiped her car as he drove by. Appellant’s car then almost hit an oncoming truck which had to slam on the brakes to avoid a head-on collision.
Appellant continued driving at approximately 50 miles per hour and ran a stop sign at 37th Place and Maple Street. Appellant’s car hit a drainage ditch and then became airborne. When the car hit the ground, it fishtailed and appellant drove into the left-hand lane. At that moment, Sanders, who was behind appellant’s car, observed two pedestrians crossing the street at *398 an unmarked crosswalk. The two pedestrians, Ozelia Hockaday and her grandson Isaac, ran toward the curb. However, appellant’s car veered off in the same direction, displayed no brake lights, struck both of the pedestrians and then hit a light post and came to rest.
Hockaday’s right leg was fractured in three places and her right ear was torn off. Isaac was pinned face down under the car. Some residents of the neighborhood pulled appellant out of his car and started beating him up. When they noticed Isaac under the car, they lifted the vehicle off the child’s body. Isaac died as a result of head injuries he sustained from being struck by appellant’s car.
After the accident, a Los Angeles police officer who arrived at the scene detected a moderate odor of alcohol on appellant’s breath, observed that his eyes were bloodshot and his speech slurred, and concluded that he was under the influence of alcohol. Appellant was transported to a hospital where another officer also noticed the odor of alcohol on appellant’s breath and that his eyes were bloodshot and his speech thick and slow. A blood sample was obtained from appellant, and his blood-alcohol level was determined to be .097 at 10:44 p.m. Subsequently, an expert criminalist theorized from projections that appellant’s blood-alcohol level was .14 at 8 p.m., the equivalent of appellant having consumed at least five 12-ounce beers. The expert deemed a person whose blood-alcohol level was .08 to be impaired for the purposes of safely driving a motor vehicle.
A police department accident-reconstruction expert found no locked-wheel skid marks at the scene of the accident, which would have indicated the hard application of car brakes. He also determined that the brakes were operable on appellant’s car and that his car was traveling at approximately 45 miles per hour when it crashed into the light post.
In defense, appellant admitted purchasing two 6-packs of tall Budweisers and claimed to have drunk only three of the cans. Just before the accident, he thought he was going to hit some parked cars so he attempted to apply the brakes, but instead put his foot on the accelerator. Appellant also claimed that he never saw the two pedestrians.
Discussion
I
 Appellant’s contention that reversal is warranted because of the court’s instruction during deadlocked deliberations is meritless. During initial instructions to the jury, the court indicated pursuant to CALJIC No. *399 17.10 that if the jury was unanimously not satisfied beyond a reasonable doubt that appellant was guilty of the charged offense of second degree murder, it could convict him of one of five lesser offenses. The lesser offenses were vehicular manslaughter with or without gross negligence, vehicular manslaughter while driving under the influence of alcohol with or without gross negligence, and involuntary manslaughter. Defense counsel repeatedly and extensively argued to the jury the lesser included offense of vehicular manslaughter while intoxicated. After four days and approximately ten hours of deliberations, the jury indicated it was deadlocked and had reached an impasse. The foreman stated that two votes had been taken on the “complete charge” and that four or five votes had been taken on unspecified “subsidiary” issues. The court then requested the jury to think about any area of clarification concerning the evidence or the instructions that might be helpful and stated that “. . . I think you’re on the right track, in that you must resolve count I, the second degree charge, before you can consider the other charges. And that’s only if you consider a not guilty as to count I. If you consider—if you can’t resolve that, of course, that precludes you from handling any of the lesser offenses.”
The court’s statement to the jury that they could not “consider” lesser offenses before acquitting on the second degree murder count was error. In People v. Kurtzman (1988) 46 Cal.3d 322 [250 Cal.Rptr. 244, 758 P.2d 572], decided several months after appellant’s trial, the Supreme Court clarified and explained the proper interpretation of its prior opinion in Stone v. Superior Court (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809], which used the word “considering” in a context which “has led to some confusion.” (Kurtzman, supra, at p. 330.)[1] As explained in Kurtzman, “the overall import of Stone is simply that the jury must acquit of the greater offense before returning a verdict on the lesser included offense, and no further control of the sequence of jury deliberations was intended.” (Ibid.) The court held that Stone “simply restricts a jury from returning a verdict on a lesser included offense before acquitting on a greater offense and does not preclude a jury from considering lesser offenses during its deliberations.” (Id. at pp. 324-325, italics in original.) However, here, as in Kurtzman, the error in the use of word “consider” was harmless.
Kurtzman found the error harmless even in the context where the court repeatedly and strictly admonished the jury “not to ‘deliberate on’ or ‘consider’ voluntary manslaughter unless and until it had unanimously agreed *400 on second degree murder.” (Kurtzman, supra, at p. 335.) In contrast, here, the court’s solitary statement to the jury used the word “consider” in an arguably ambiguous manner. The court stated that the jury “must resolve count I, the second degree murder charge, before you can consider the other charges.” However, in the next breath, the court stated, “And that’s only if you consider a not guilty as to count I,” obviously using the word “consider” to mean to return a verdict and not just to consider. The final remark to the jury was “If you consider—if you can’t resolve that, of course, that precludes you from handling any of the lesser offenses.” This final statement reveals the court’s halting use of the word “consider” when it actually meant to “resolve” by finding guilty or not guilty as to count I. Accordingly, the court did not attempt to restrict the jury from considering evidence of lesser included offenses in a clear, forceful and repeated manner.
Moreover, as in Kurtzman, where the error was found harmless, the jurors were initially instructed pursuant to CALJIC No. 17.10 that if they were not satisfied unanimously that appellant was guilty of murder, they could find him guilty of one of numerous possible lesser offenses. They were also admonished that if in doubt between murder and manslaughter, they should resolve in favor of manslaughter. (CALJIC No. 8.72.) Such instructions did not preclude the jurors from considering a lesser offense, at least for the four days prior to the court’s contested use of the word “consider.” Appellant urges that after the court’s statement, the jurors no longer deliberated on any lesser included offenses and raised questions “exclusively on second degree murder.” However, the jury’s questions focused on appellant’s mental state, and it is unlikely that the jury would, or even could as a practical matter, discuss appellant’s state of mind without considering the requisites for manslaughter as well as murder.
In sum, given the possibly ambiguous nature of the court’s statement which is at issue, the absence of any indication that the statement thwarted the continuation of an appropriately full pattern of deliberations, and the substantial evidence of second degree murder which appellant does not contest, the court’s use of the word “consider” was harmless.
II
Appellant’s contention that the implied malice instruction was prejudicially unclear and misleading is without merit. Appellant apparently urges, in particular, that the jury was not adequately informed that it must find appellant subjectively appreciated the risk of harm before the jury could convict appellant of second degree murder.
Pursuant to the request by appellant’s trial counsel, the court instructed the jury virtually verbatim in the language of CALJIC No. 8.31 (1983 rev.), *401 which defines second degree murder based on implied malice. The court instructed the jury as follows: “Murder of the second degree is the unlawful killing of a human being as a direct and causal result of an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose, and with wanton disregard for human life. That is to say the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another, and who acts with conscious disregard for human life, [fl] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being, [fl] A finding of implied malice aforethought is made by applying a subjective test. There must be a determination that the defendant actually appreciated the risk involved and deliberately acted thereafter.”
The language in the instruction in all essential regards tracks the definition of second degree murder based on implied malice as given in People v. Watson (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279]. In fact, the court’s instruction to the jury modified the then-existing CALJIC version of the instruction in one minor regard and arguably improved upon it in a way which more accurately reflected the language in Watson. The second sentence of the CALJIC instruction starts with the word “or,” rather than the trial court’s language, “That is to say,” or the language used in Watson, supra, at page 300, “Phrased in a different way.” The court’s version, like the language in Watson, clearly explained that the clause in question was simply an alternative description and did not foster any possible misimpression that there are two different tests for implied malice, one which does not require the jury to find under a subjective standard that appellant actually appreciated the risk of harm. Although some courts have indicated concern over a possible misimpression from this use of the word “or” (see, e.g., People v. Protopappas (1988) 201 Cal.App.3d 152, 163 [246 Cal.Rptr. 915]; People v. James (1987) 196 Cal.App.3d 272, 290 [241 Cal.Rptr. 691]), the trial court deftly echoed almost the exact language set forth in Watson. Moreover, when the jury asked several questions regarding implied malice, the court replied, in part, by reiterating that the two phrases describing implied malice were simply restatements of each other where “one defines the other.”[2]
*402 III
Contrary to appellant’s contention, the trial court’s reply to a juror’s inquiry that the jurors could change the jury foreman did not pressure dissenting jurors to acquiesce in the verdict. On the sixth day of deliberations, the jury foreman’s note indicated, “There’s no possibility of reaching a verdict.” In response to the court’s inquiry, the foreman, Mr. Beckett, stated he did not believe there was a reasonable possibility that the jury might reach a verdict. When the court asked the other jurors if anyone disagreed with this assessment, juror number 12, Mr. Johnson, stated his belief that “we could” reach a decision. When the court asked if anyone else felt the same way, three other jurors nodded their heads. After the court concluded that the jury was not yet at the point where it was unable to reach a decision and suggested they take a break, juror number eight inquired, “Is it possible to change foremans [s/c]?” The court stated that “[The] presiding juror is strictly within the province of the jury. There is no rule against it. He’s not given a separate oath of office or anything. So if there is a palace coup, that can happen, I suppose. Just make it, as they say, bloodless.” On the seventh day of deliberations, a new foreman, Mr. Johnson, returned the jury’s verdict.
Allowing the jury to select a new foreman did not pressure dissenting jurors. Although apparently no statute or case directly addresses whether the jury has such power, the jury’s ability to elect its own foreman has been implied from article I, section 16 of the California Constitution, which provides that “[t]rial by jury is an inviolate right and shall be secured to all . . . .” (See Dorshkind v. Harry N. Koff Agency, Inc. (1976) 64 Cal.App.3d 302, 308 [134 Cal.Rptr. 344]; see also 7 Witkin, Summary of Cal. Law (3d ed. 1985) Trial, § 301, p. 300.) Just as the jurors initially select their own foreman, they are free to change their minds and select a new foreman.
At the conclusion of the initial jury instructions, the court gave the traditional instruction, pursuant to CALJIC No. 17.50, concerning the selection and role of the foreman. The jury was advised, “You shall now retire and select one of your number to act as presiding juror who will preside over your deliberations. [After the verdict is agreed upon, the verdict form must be] dated and signed by your presiding juror . . . .” (See also BAJI No. 15.50.) This comports with the only statutory task of the foreman, which, pursuant to Penal Code section 1149, is to advise the court or the clerk whether the jurors have agreed upon their verdict.
Nothing the court said at any stage in any way effectively pressured dissenting jurors to acquiesce in the verdict. The idea for a new foreman came from one of the jurors and not from the judge. The judge accurately *403 stated that the selection of a foreman is “strictly within the province of the jury” and “[tjhere is no rule against” selecting a new foreman. The situation here is thus in stark contrast to that in Dorshkind, supra, 64 Cal.App.3d 302, where the judge hand picked the foreman and created the danger that “some jurors [would] feel a certain amount of deference is due to the opinion of the person selected by the trial judge . . . .” (Id. at p. 308.) Nor did the judge’s jocular and yet astute remark that any “palace coup” should be “bloodless” pressure dissenting jurors. Obviously, the purpose of this statement was merely to caution the jurors that if they decided to select a new foreman, as a matter of common sense, it should be done as tactfully as possible. Nothing coercive was reflected or intended by this statement.
Disposition
The judgment is affirmed.
Lucas, P. J., and Ashby, J., concurred.
Appellant’s petition for review by the Supreme Court was denied October 25, 1989.

 The confusion arose from the statement in Stone that “The jury must be cautioned, of course, that it should first decide whether the defendant is guilty of the greater offense before considering the lesser offense, and that if it finds the defendant guilty of the greater offense, or if it is unable to agree on that offense, it should not return a verdict on the lesser offense.” (Stone, supra, at p. 519.)

The court also properly explained in response to the jury’s related questions (1) that “base,” in the context of the murder instruction which it reread, means “low or vile,” (2) that “antisocial” was self-explanatory, (3) that a “conscious disregard for human life” was not an automatic conclusion but could flow inferentially from appellant’s deliberate conduct and appreciation of the risk, and (4) that the subjective test used in finding implied malice was defined within malice aforethought which it explained for the jury.