[No. G002111. Fourth Dist., Div. Three. May 13, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY PROTOPAPPAS, Defendant and Appellant.

[Opinion certified for partial publication.[1]]

---

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, parts IV, V and all except the dispositional sentence of part VI are ordered not published.

154

COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Michael D. Wellington and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WALLIN, J.—A jury found Tony Protopappas, a licensed dentist and oral surgeon, guilty of the second degree murder of three of his patients. He appeals.[2]

Protopappas opened his Costa Mesa dental clinic in 1974. By September of 1982, he employed a staff of five dentists, many dental assistants, and two office managers. He was the only dentist at the clinic licensed to administer general anesthesia and was solely responsible for injecting the initial doses of drugs used for general anesthesia patients. He personally standardized

[2] We previously filed our opinion affirming the judgment. The Supreme Court granted review and retransferred the matter to us with directions to delete a reference to an opinion depublished after our opinion was filed. Oddly, we were not directed to reconsider our discussion of the issue involved although we had followed the depublished case. Odder still, we were directed to refile our opinion upon the finality of another case cited in the same discussion, but when that case became final, it, too, was depublished.

We could not refile our opinion with a reference to the second depublished case without violating the California Rules of Court, rule 977, but the Supreme Court's order did not specifically authorize us to delete the case. We assume that the court simply failed to anticipate its future action and that its order was not designed to prevent us from making this and other appropriate minor modifications in light of events after the filing of our original opinion. Since certain portions of the opinion clearly meet some or all of the standards for publication (Cal. Rules of Court, rule 976(b)), we also infer we have a continuing duty to direct partial publication. Any other interpretation would imply that the Supreme Court may require us to exercise our lawful discretion in a particular way without an opinion stating reasons. This it may not do. (*Gillaizeau* v. *Bank of America* (1986) 179 Cal.App.3d 836, 838-839 [224 Cal.Rptr. 914].)

these initial doses or "setups" which were prepared daily by his assistants. The staff dentists were also given standardized instructions on how to maintain patients under anesthesia.

*Kim Andreassen*

At a frail 85 pounds, 24-year-old Kim Andreassen went to Protopappas's clinic with her mother on September 21, 1982. Although she was not experiencing any pain or problems with her teeth, she decided to have an initial examination after Protopappas finished her mother's evaluation. Andreassen told Protopappas she suffered from lupus (a multisystem disease inhibiting normal growth), total kidney failure requiring thrice weekly dialysis, high blood pressure, anemia, a heart murmur, and chronic seizure disorder. Andreassen also told Protopappas she was taking anticoagulants, high blood pressure medication, and phenobarbital. After the examination, Protopappas told her she needed a root canal, three fillings, and a crown. He recommended local anesthesia to perform the work. Andreassen protested, refusing to have any work done unless she was asleep. Protopappas warned her that, because of her poor health, there was a very high risk she could die under general anesthesia.

Andreassen returned to the clinic with her mother on September 28. The office manager, who had contacted Andreassen's general physician, informed Protopappas she was not to be placed under general anesthesia even for a short time. Andreassen was given preoperative medications to be taken 30 minutes before her next appointment. Protopappas was later heard telling the office manager of his reluctance to sedate Andreassen intravenously, saying, "I don't want to do that because that's a death for sure."

Having failed to take her premedication as directed, Andreassen arrived at the clinic for treatment between 12 noon and 1 p.m. on September 30. She then took the medication. Around 2 p.m., Protopappas began an intravenous (I.V.) setup. At Andreassen's suggestion, he started it in her foot because of her collapsed veins. He administered his standard doses of drugs at 10- to 20-second intervals. He also gave her a local anesthetic. By the time he finished administering the drugs, Andreassen was asleep.

Protopappas began the scheduled treatment. Within five to twenty minutes, Andreassen's lips turned purple, her face pale blue, and her pulse became irregular. Protopappas administered oxygen and her lip color returned to normal. At one point, upon getting restless and opening her eyes,

she was given brevital.[3] When an assistant noticed Andreassen was taking very shallow breaths followed by big deep breaths, he directed Protopappas's attention to the irregular breathing. Protopappas responded, "Maybe that's normal for her because she is so ill."[4] He completed the dental work. Andreassen was breathing normally when he left the room at 4:30 p.m.

Ten to fifteen minutes later her breathing became shallow and irregular, her pulse became weak, and her face turned blue. The attending assistant gave her oxygen, and when Andreassen did not respond, she called another dentist, Dr. Brown, to help. He observed that Andreassen had gone into respiratory collapse and immediately placed an oxygen mask on her face. Two to three minutes later, Protopappas arrived and gave her oxygen. When she failed to respond, he left the room to get additional medication. Either Protopappas or his assistant brought in narcan, a medication to reverse the effects of the drugs she had received. Protopappas administered the narcan. Fire department paramedics were called shortly thereafter.

When the paramedics arrived, Andreassen was not breathing, her pupils did not respond to light, she had no pulse, and she was blue. Protopappas was holding a disposable oxygen mask over her face. He reported the patient had been in this condition for 20 minutes, and he did not have any positive pressure oxygen equipment.[5] Despite the efforts of the paramedics, Andreassen was clinically dead when she arrived at the hospital.

The coroner concluded the general anesthesia resulted in critical cardiac arrest with the disseminated lupus being a significant contributing factor. Two anesthesiologists and two oral surgeons testifying as expert witnesses opined that she died of a massive drug overdose. One oral surgeon stated the amount of drugs given were massive amounts for anyone, "let alone a sickly 88 pound girl." He further explained the combination of drugs administered did not make any sense. "It is not a regimen to sedate a patient. It is illogical. It is—I don't know anybody who does this kind of thing for sedation or anesthesia. It is a use of multiple depressant agents. You never

[3] A contested factual issue at trial was whether Andreassen was put under general anesthesia. Protopappas testified she was not; she was given an I.V. or conscious sedation instead. Tracy Peek, an assistant, testified she saw Protopappas give Andreassen brevital, a drug used to put a patient under general anesthesia, and was sure she had recorded in Andreassen's chart that brevital was given. Peek's handwritten notations, however, did not appear on the chart admitted at trial. The prosecutor argued the chart had been altered by Lola Balthaser, an office manager and former dental assistant.

[4] An expert in the field of anesthesiology testified the breathing pattern exhibited by Andreassen is known as Cheynes-Stokes respiration. It is a symptom of severe toxicity and a terminal type of respiration.

[5] A disposable oxygen mask does not supply oxygen to a patient who is not breathing. By contrast, positive pressure oxygen equipment will deliver oxygen to a patient under pressure and will breathe for the patient who is not breathing.

know which agent is doing what. You have no way of knowing where the patient is with regard to response to any of these medications. It is crazy. It is really an illogical approach to treating people."

Dr. Frank McCarthy, chair of the anesthesiology department at the University of Southern California's dental school, testified that Andreassen's irregular breathing was symptomatic of severe toxicity and should have been interpreted as urgent and life threatening. He concluded Protopappas did not recognize or respond to Andreassen's Cheynes-Stokes breathing. Moreover, his delay in calling the paramedics endangered her life and, without effective cardio-pulmonary resuscitation (CPR) after her heart stopped, she suffered brain death.

Protopappas testified in his own defense. He felt the deep cavity in Andreassen's tooth needed a root canal or the lupus would cause infection to spread and would become life threatening. He did not put her under general anesthesia but used conscious sedation instead. In his opinion Andreassen's irregular breathing did not present an emergency and, having felt a pulse, he did not feel CPR was necessary. When she failed to respond to the administration of oxygen and narcan, however, he put a local anesthetic under her tongue with a drug to stimulate the heart.

*Patricia Craven*

Except for her swollen tonsils, 13-year-old Patricia Craven was active and healthy when she went to Protopappas on February 8, 1983, to have four wisdom teeth pulled, eight teeth filled, and a tooth crowned.[6] Her mother remained with her as Protopappas administered his standard setup of intravenous medications at approximately 11 a.m. He assured Craven's mother the enlarged tonsils would not be a problem but that her daughter would be watched more closely. A few minutes after the first injection, Craven appeared to hold her breath and became pale. Protopappas gave her oxygen and 10 minutes later left the room.

As soon as she was sure Craven's mother had left the operating room, a second dentist, Dr. Marietta Badea, entered to do the fillings and prepare for the crown. Protopappas instructed her to give prearranged doses of various drugs to Craven whenever she showed signs of coming out of anesthesia (becoming light). He also cautioned her about the swollen tonsils. Dr. Badea was not licensed to administer anesthesia medications.

[6]The number of dental procedures proposed for Craven while she was under general anesthesia might appear excessive to a layman, but according to McCarthy they could be competently done in two hours, a reasonable time to be under an appropriate general anesthetic. He also testified the condition of her tonsils did not rule out the use of general sedation.

Dr. Badea began her work at approximately 11:30 a.m. Within the next two and one-half to three hours, Craven became light nearly a dozen times. The second time this occurred, just before noon, Protopappas came into the operating room cursing, "Goddamm it. She is light. Why don't you keep her down? Why don't you give her enough?" Each time Craven became light, Dr. Badea gave her additional intravenous drugs without supplemental oxygen. She was scared about the quantity the adolescent had received but Protopappas, never again leaving his own patient to check on Craven's condition, ordered her to administer more drugs to keep Craven down. When told Craven exhibited a red reaction on her arm, he made a similar long-distance order to change medication.

Dr. Badea finished her work between 2:30 and 3 p.m. and, alarmed at the amount of drugs already given to Craven, she asked Protopappas to hurry. He directed her to keep the girl down until he was able to perform the extractions. When Craven awoke again, Dr. Badea gave her more drugs as ordered.

Protopappas did not return to Craven's operating room for another half an hour. He gave her additional anesthetic. After extracting four teeth in 45 minutes, he placed a gauze pack in the right side of her mouth. She had more trouble breathing but when he left she was very sedated, not moving at all. He returned 10 minutes later to suction her throat. She was so deeply sedated she failed to gag when suctioned. Although he acknowledged the swollen tonsils would probably impair Craven's breathing, he left the room shortly thereafter.

The office manager and Protopappas tried, unsuccessfully, to awaken Craven to go home. They called her name and slapped her face, but she failed to respond. Even when Protopappas gave Craven medication to reverse the effects of the anesthetics, she remained unresponsive. He told her mother she was "very deep under" and it would be at least one hour before she would awaken.

Dr. James Rolfe, another staff dentist at the clinic, helped discharge Craven once he was told she was ready. Her breathing was noisy and her tongue was sticking out. Having never assisted with a patient so unresponsive, he asked the office manager if Protopappas was available to check her. She told him he was not available and the patient would be fine. He remained concerned about her breathing and whether she was receiving sufficient oxygen. He carried her to the car, placed her with her mouth down to allow the fluid to drain, and told her mother to watch her breathing. Protopappas wrote in her dental chart that a "semi-delirious" Craven

was released with labored breathing due to excessively large tonsils and the gauze placed in her throat.

Craven never regained consciousness. When her breathing became shallow after arriving home, her mother called the paramedics. She was in full cardiac arrest when they arrived. She was admitted to the hospital and maintained on a respirator. She died 11 days later. Protopappas later told another staff dentist Craven's swollen tonsils constricted her airway during the surgery.

The coroner attributed the death to cardiac arrest caused by the combined effect of the medication received. Once comatose, Craven developed pneumonia in the right lung which was the immediate cause of her death.

The prosecution's experts voiced unanimity. Craven suffered a massive drug overdose and died as a result of Protopappas's failure to closely supervise her and to recognize her obstructed airway. In addition, Dr. McCarthy testified that turning the adolescent over to a dentist not licensed to administer anesthetics with standing orders to give certain drugs was an act likely to kill her, as was her release while unresponsive, unconscious, completely limp, and breathing irregularly. Released in that condition, she could not be properly monitored to protect her airway.

Protopappas's own testimony paralleled that of his office staff in most respects. He elaborated, however, on his personal observation of Craven during recovery and his lack of involvement in releasing her. He stated he checked on her several times during the first hour following the extractions. The first time he checked, Craven's condition was stable. The second time she looked good, but was not responsive, so he gave her narcan. He observed his office manager trying to wake her up 15 to 20 minutes later. Craven still looked good and reacted when he pinched her ear. Protopappas instructed his staff to keep her there to sleep off the anesthesia, but when he returned to check on her, she had been released.

*Cathryn Jones*

While Craven remained in a coma, 31-year-old Cathryn Jones arrived at the Protopappas clinic on February 11, 1983. She had had a pituitary tumor removed nine months earlier and was suffering from periodontitis, bone loss, and abscess formation around a great number of her teeth. On Protopappas's advice, she decided to have her teeth removed.

Before administering Protopappas's standard setup, one of his assistants contacted Jones's physician for approval. Her physician approved the use of

sodium pentothal only. He testified no mention was made of the drugs used in the setup; moreover, he would never have approved such high dosages, realizing they could cause respiratory depression.

Protopappas then examined Jones and determined she was in good health. He noticed a red rash on her neck which she told him was a nervous reaction. It took him about 30 minutes to place her under general anesthesia using his standard setup. He then began removing her teeth.

About one and one-half hours into the operation, the dental assistant told Protopappas Jones's lips were turning purple. Protopappas testified he looked at her lips but they were not blue. He did not take her pulse because bright red blood was squirting in her mouth indicating to him that she was properly oxygenated. A short while later the assistant again told Protopappas Jones's lips were turning purple. He became angry and told the assistant she did not know what purple was. Comparing Jones's lips to a purple syringe cap he held up, Protopappas said, "Goddamn it, this is purple," and pointing to her lips, "this is not." The assistant warned him of Jones's deteriorating condition a third time, this time pointing out that her fingernails were blue. Protopappas insisted they were pink.

The assistant left the patient to get more drugs. When she returned, Jones did not appear to be breathing. Her hands were cold and her fingernails were purple. Finally acknowledging Jones needed oxygen, Protopappas finished suturing before giving her three short breaths through an oxygen mask. She did not respond. The assistant could not hear a heartbeat but Protopappas said he detected a faint one. He began CPR and sent his assistant to get some narcan. He then stopped to give her a local anesthetic under the tongue to stimulate her heart. According to Protopappas, he did not give her oxygen sooner because she was bleeding pulsating oxygenated blood and he did not want her to aspirate either the blood or the gauze packing.

Seven to ten minutes after the emergency arose, an assistant asked Protopappas for the third time if the paramedics should be called and he finally responded affirmatively. He stopped the chest compressions to answer inquiries and gave mouth-to-mouth resuscitation, rather than using an oxygen mask. The paramedics rushed Jones to the hospital where she was put on a respirator. She remained in a coma, however, and died two days later.

The coroner concluded Jones died from bleeding in the lungs and cardiac arrest following local and general anesthesia. The prosecution's experts testified the massive amounts of drugs given to her were lethal. In addition to the excessive amount of anesthesia given, Dr. McCarthy outlined

numerous life-endangering acts: continuing the extractions without checking on the patient's respiration, delay in giving oxygen and in calling the paramedics, administration of the local anesthetic, and interrupting CPR once chest compressions had been started.

## I

Attacking the jury's finding of implied malice on many different fronts, Protopappas claims instructional error, legislative abolition of the distinction between second degree murder and involuntary manslaughter, and insufficiency of the evidence. We conclude that even if the jury was improperly instructed on the law of implied malice, the error was harmless beyond a reasonable doubt, and substantial evidence supports the jury's findings.

Protopappas alleges two instructional errors:

A. *Alternative definitions of implied malice.*

Protopappas first contends the jury was instructed on two alternative definitions of implied malice, one of which erroneously negates the element of subjective awareness of the risk of death. The jury was instructed, "Malice is implied when the killing results from an intentional act or acts involving a high degree of probability that they will result in death, which act or acts are done for a base, anti-social purpose and with a wanton disregard for human life, or when the killing results from doing an act or acts, the natural consequences of which are dangerous to life, which act or acts are deliberately done by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (CALJIC No. 8.11 (1982 Rev. as modified).)[7]

Protopappas objects to the language of the first definition directing the jury to find implied malice "when the killing results from an intentional act or acts involving a high degree of probability that they would result in death, which act or acts are done for a base, antisocial purpose and with a wanton disregard for human life . . . ." He argues this language allowed the jury to find implied malice without considering whether he was subjectively aware his dental treatment jeopardized the lives of his patients.

The Legislature has provided little guidance in defining implied malice. The only statutory description of the requisite mental state appears in Penal Code section 188: "[Malice] is implied, when no considerable provocation

[7] Second degree murder was defined for the jury using virtually identical language. (CALJIC No. 8.31 (1983 Rev. as modified).)

appears, or when the circumstances attending the killing show an abandoned and malignant heart." As Protopappas suggests, two lines of cases reflect judicial attempts to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply. (Compare *People* v. *Poddar* (1974) 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1] [implying malice when acts are done for a base, antisocial purpose and with a wanton disregard for human life] with *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913] overruled on other grounds in *People* v. *Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353] [implying malice when acts are deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life].)

The Supreme Court in *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279] accepted the phraseology used in both lines of cases and concluded they were simply two different ways of saying the same thing. The court stated, "We have said that second degree murder based on implied malice has been committed when a person does '"'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'" . . . .' [Citation.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Id.*, at p. 300.)

Unfortunately, the drafters of CALJIC substituted "or" for the Supreme Court's transition, "[p]hrased in a different way," thereby making the instruction susceptible to the interpretation suggested by Protopappas. (*People* v. *James* (1987) 196 Cal.App.3d 272, 290 [241 Cal.Rptr. 691].) Nevertheless, we need not decide whether the court erred in giving the standard CALJIC instruction because any potential error was harmless beyond a reasonable doubt.

Here, the entire thrust of the prosecution's case was that Protopappas *knew* his procedures threatened his patients' lives. The prosecutor carefully and repeatedly emphasized Protopappas's subjective awareness in closing argument: "The first element of implied malice on these facts is that the killing results from somebody intentionally doing acts which are dangerous to life. We clearly have that in every instance here. Utterly no dispute about it. Those acts are deliberately done by a person who knows that his conduct

endangers the life of another. [¶] And the second thing, acts with what the law calls conscious disregard for life. . . . And you have implied malice under these facts because you have Tony Protopappas intentionally injecting potentially lethal drugs into people to do dental work. He knows that this conduct will endanger the life of his patient if he doesn't do it with great care. He has actual personal knowledge of the specific risk faced by each victim in this case, over and above his general knowledge that he possessed of the dangerousness of what he was doing. He knew in each particular case that there were specific, special risks posed to each victim by what he was doing, and he acted with conscious disregard of the lives of Kim Andreassen and Patricia Craven and Cathryn Jones."

The prosecutor went on to distinguish second degree murder from involuntary manslaughter, again stressing the crucial element of the defendant's awareness of the risks: " . . . [F]rom going through this analysis, you see there's a great similarity in the law between what the law calls due caution and circumspection and what the law calls implied malice, and I'll just flip back to that—they're very similar. They are so similar, in fact, that many lawyers can't tell them apart, almost identical to the language on implied malice. [¶] If the killing results from intentionally doing an act which is dangerous to life and you know that it's dangerous to life and you act in conscious disregard for life, then that's implied malice. [¶] What's the difference? The difference is in realizing the risk, okay? . . . [¶] . . . You see where the defendant's appreciation of the risk is the key to distinguishing between these two things. You ask yourself, we see facts that support murder and support manslaughter. Under implied malice analysis or involuntary manslaughter analysis. How do you tell the difference? [¶] You ask *the question, did the defendant realize the risk to the victim.* If he acted without realizing the risk, it's manslaughter. [¶] I'm going to read you the last portion of this instruction. 'If, on the contrary, he had realized the risk and acted in total disregard of the danger to life involved, malice would be implied and he could be guilty of murder.' [¶] It's really a question of the extent of the defendant's awareness of the risks involved."

Any potential for misuse resulting from the ambiguity of CALJIC No. 8.11 was effectively eliminated. The case was tried and argued on the crucial element of implied malice; that is, Protopappas *knew* his patients might die but he treated them with lethal doses of anesthetics *anyway.* Therefore, any instructional error was harmless beyond a reasonable doubt.

B. *Negligent murder.*

Protopappas also claims the instructions misled the jury into finding him guilty of murder if they found he acted with ordinary, civil negligence.

The jury was told, "The unintentional killing of a human being is excusable and not unlawful when committed by accident and misfortune in the performance of a lawful act by lawful means and where the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances." (CALJIC No. 5.00.) The court did not instruct the jury, as requested by Protopappas, that "[w]hen a person commits an act or makes an omission through misfortune or by accident under circumstances that show no evil purpose, intention or culpable negligence, he does not thereby commit a crime." (CALJIC No. 4.45 (4th ed. 1979).)

Taken alone, CALJIC No. 5.00 might, as suggested by Protopappas, tempt a jury to convict on a finding of mere civil negligence. The instructions, however, must be read together. (*People* v. *Velez* (1983) 144 Cal.App.3d 558, 567-568 [192 Cal.Rptr. 686].) The jury was repeatedly admonished that it was necessary to find aggravated, culpable, or gross negligence, or implied malice to hold Protopappas criminally responsible. Even if CALJIC No. 5.00 was potentially misleading, the jury's finding of implied malice is inconsistent with a finding of ordinary negligence. Thus, the factual issue must have been resolved against him. (*People* v. *Brucker* (1983) 148 Cal.App.3d 230, 240 [195 Cal.Rptr. 808].) Moreover, the proffered instruction was incomplete because it did not inform the jury what to do if it did find ordinary negligence. Therefore, it did not cure any deficiency in No. 5.00.

II

Protopappas contends the Legislature has inadvertently abolished the difference between second degree murder and involuntary manslaughter by redefining malice aforethought. As amended in 1981 and 1982, Penal Code section 188 expressly provides that awareness of a duty to conform to the law is not included within the definition of malice. The relevant part reads: "[Malice] is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice." Protopappas argues this added

proviso has blurred the distinction between murder and manslaughter, thereby violating his constitutional right to due process.[8]

Although the Supreme Court has yet to comment on the legislative revision, the language is neither unconstitutionally vague nor reasonably susceptible to the interpretation suggested by Protopappas. The Legislature actually eliminated some unfortunate confusion which had evolved in the cases discussing implied malice. As the courts struggled to define the statutory phrase "abandoned and malignant heart," some cases included the necessity of finding an awareness of a duty to act within the law. (*People* v. *Poddar, supra,* 10 Cal.3d 750; *People* v. *Sedeno, supra,* 10 Cal.3d 703; *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].) Protopappas seems to suggest the Legislature has been permanently shackled with this judicially formulated definition.

Awareness of a duty to act within the law is not synonymous with a subjective awareness of the risk of death. The Legislature has determined only those who realize the inherent threat to life, and not merely an abstract duty to conform their conduct to the law, and who act in spite of their awareness, are sufficiently culpable to be held accountable for murder. The legislative amendment actually clarified the definition of malice by expressly excluding any unnecessary and confusing reference to societal duties.

Moreover, the mere elimination of the awareness of a duty does not obliterate the distinction between involuntary manslaughter and second degree murder. The aggravated, culpable, gross negligence necessary to a conviction of involuntary manslaughter does not include the subjective appreciation of the risk of death necessary to a finding of implied malice. The instructions read to the jury were anything but vague; the distinctions between the crimes were clearly explained.

III

Protopappas next contends there is insufficient evidence of implied malice to sustain the convictions for second degree murder and seeks modification to involuntary manslaughter. He concedes he may have been inept, but emphasizes there is little precedent for implying malice from his failure to provide proper medical treatment. His case does appear to be one of second impression. (See *People* v. *Phillips* (1969) 270 Cal.App.2d 381 [75 Cal.Rptr. 720, 45 A.L.R.3d 105].) The issue presented, whether a licensed provider of health services designed, presumably, to improve the patient's

[8] The jury instructions given here predated the legislative revisions and therefore could not have jeopardized the jurors' understanding of the task before them.

health, can be held for murder when life is unintentionally lost as a result of his efforts, has rather startling implications.[9] Nevertheless, the scope of appellate review is narrowly circumscribed.

An appellate court reviewing a "conviction challenged as lacking evidentiary support . . . must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) "'The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.'" (*People* v. *Love* (1980) 111 Cal.App.3d 98, 106 [168 Cal.Rptr. 407], quoting *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].)

The criteria for reviewing the evidence of implied malice were described by the Supreme Court in *People* v. *Watson, supra,* 30 Cal.3d at pages 296-297. "[*M*]*alice* may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. . . . Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence. . . . [A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." It is "an element of viciousness—an extreme indifference to the value of human life." (*People* v. *Love, supra,* 111 Cal.App.3d at p. 105.) The question is whether there was substantial evidence Protopappas's treatment of his patients was "'aggravated, culpable, gross, or reckless' neglect 'incompatible with a proper regard for human life' (involuntary manslaughter) or involved such a high degree of probability that it would result in death that it constituted 'a wanton disregard for human life' making it second degree murder." (*People* v. *Burden* (1977) 72 Cal.App.3d 603, 615 [140 Cal.Rptr. 282].)

[9]The most troubling aspect of this case is that Protopappas has been convicted of murder for acts committed as a practicing, licensed dentist under circumstances where there can be no doubt he did not truly intend to kill anyone. Dying patients would be bad for business; and nothing shines through this record quite so brightly as Protopappas's enthusiasm for making money—lots of it. Certainly every reasonable dentist or physician examining this opinion would agree Protopappas was grossly negligent in each of these three homicides, but where is the evidence of the malice necessary to justify a murder conviction? For the benefit of the concerned dental or medical professional, the answer to that question is simple: This case is highly unusual and, hopefully, unlikely to recur; for it is the health care equivalent of shooting into a crowd or setting a lethal mantrap in a dark alley.

A. Was there substantial evidence Protopappas knew his conduct endangered Kim Andreassen's life and that he nonetheless acted deliberately in conscious disregard of her life?

Protopappas agrees there was some evidence he was aware of the risk of death, but argues it was not substantial. He emphasizes that a review of the entire record discloses he was not acting with wanton disregard for his patient's well being. He would not have consciously and deliberately jeopardized a dental practice he had successfully developed over many years. Moreover, he had used his standardized methods on many patients and none of them had died before Andreassen. Even Andreassen's treatment proceeded normally until after the work was completed. Finally, he concludes the evidence of an overdose is insufficient because anesthesiologists disagree on the quantity of drugs constituting an overdose for a particular patient.

This argument is unavailing as it relies on evidence and inferences not accepted by the jury. (See *People* v. *Summers* (1983) 147 Cal.App.3d 180, 183 [195 Cal.Rptr. 21].) The evidence, viewed in the light most favorable to the prosecution, supports the jury's finding Protopappas was subjectively aware of the risk and acted with wanton disregard for Andreassen's life. He knew there was a very high probability Andreassen would die. He told Andreassen, her mother, and many of his staff she probably would not survive the treatment under general anesthesia because of her extremely poor health. He not only knew how sick she was but also that her treating physician had only authorized a local anesthetic and a small amount of muscle relaxant. Nevertheless, he administered a quantity of drugs that would be massive for anyone, "let alone a sickly 88 pound girl."

If the initial dosage of anesthetic were not substantial evidence of Protopappas's conscious disregard for Andreassen's life, then the jury could add to it his indifference to the difficulty she thereafter experienced. He observed her irregular breathing and did nothing. When she finally turned blue, had only a weak pulse, and exhibited very shallow and irregular breathing, he put a disposable oxygen mask over her mouth. Although he at least recognized the emergency at that point, he failed to call the paramedics immediately or begin CPR. The jury could find he exhibited all the elements of implied malice including wantonness, an extreme indifference to Andreassen's life, and subjective awareness of the very high probability of her death.

B. *Was there substantial evidence Protopappas knew his conduct endangered Patricia Craven's life and that he nonetheless acted deliberately in conscious disregard of her life?*

Protopappas contends neither of the two possible bases for a finding of implied malice was supported by substantial evidence. First, he argues

reliance on Dr. Badea to perform a portion of the treatment and to administer anesthetics could not evidence a wanton disregard for his patients since Dr. Badea had been assisting him in the same manner two to three times a week and no other emergencies had arisen. Secondly, he contends the jury could not imply malice from Craven's release in a helpless condition because she was actually discharged by Dr. Rolfe and one of the assistants. He maintains that without more evidence linking him to the discharge, wanton disregard for her life was not established.

The jury, however, listened to testimony that Protopappas observed his young patient's enlarged tonsils before sedating her, had difficulty maintaining her airway during her surgery, and realized she was so deeply sedated before discharge she had failed to gag when suctioned. He was subjectively aware his procedures would, and actually did, impair her breathing.

The jury heard much more. Craven and her mother were told sodium pentothal would be used and that it would be administered by Protopappas, who would also perform the dental work. Instead, Craven was given the standard concoction of drugs without regard to her age or weight. Not only was this combination inappropriate for any patient, but according to McCarthy, the failure to tailor the dosage to a child was grossly irresponsible. Next, when Craven's mother departed, Protopappas did not continue to administer the drugs or perform the initial dental procedures. Worse, he did not personally monitor Craven, even periodically.

Instead, from the wings emerged Dr. Badea, a Greek-speaking, Rumanian-trained dentist whose English was difficult to follow even by staff members who worked with her daily. Badea's only education in the administration of general anesthesia was a brief orientation from Protopappas primarily designed to guide her in preventing a patient from becoming light. She had no license to use general anesthetics, but administer them she did.

Protopappas himself retired to work on another patient who was also under general anesthesia. There were in fact three patients besides Craven who received general anesthesia the same day; and, of the staff dentists, only Protopappas was licensed to use general anesthesia. It appears as many as four patients may have been under at the same time; all were his responsibility. Of course, he could only directly monitor the individual he was treating, and even the monitoring of that patient was subject to interruptions concerning the others.

The jurors listened to additional testimony of Protopappas's extreme indifference to Craven's well-being. They were told Craven was given various anesthetics for five hours without his personal attention. They heard of

his anger when she was allowed to become light followed by his standing order to give her additional drugs to keep her under sedation. Although he was told repeatedly Craven was resistant to the medication, he continued to direct Dr. Badea to give her more drugs without personally checking on her condition. The jury also listened to testimony demonstrating Protopappas was very aware how sedated she was by the time he had finished the extractions and how unresponsive she remained prior to her discharge.

At this point, viewing the evidence in the light most favorable to the judgment, Protopappas simply abandoned Craven. Instead of summoning paramedics, he either left her further treatment to his staff or, as suggested by an adoptive admission received in evidence, actually authorized her discharge.

Enter now from the wings another Protopappas minion, Dr. Rolfe. Rolfe, admittedly known as the "Hippie Dentist of Laguna Beach" in the halcyon days of LSD in the 1960's, had little in the way of training in the use of general anesthesia, although he had administered personal doses of LSD and marijuana in times past. Rolfe had recently left a commune where he had resided some nine years, and he and his wife were currently living in a camper in Protopappas's parking lot.

Rolfe was so desperate for employment, he admittedly performed unnecessary root canals and other dental services for Protopappas on a regular basis. He, too, administered general anesthetics to patients who believed they were being treated and sedated only by Protopappas, notwithstanding his lack of a license to do so. Even Rolfe was concerned about Craven's release, but he made no objection to her departure, meekly accepting the statement that Protopappas was unavailable.

The jurors apparently did not accept Protopappas's attempt to delegate culpability to his staff. They apparently found, and there was reasonable, credible evidence to support their finding, that he personally was aware the heavy sedation of an adolescent with extremely swollen tonsils posed a very high probability of death, and yet acted in wanton disregard of her life by failing to assure she was properly monitored after surgery.

C. *Was there substantial evidence Protopappas knew his conduct endangered Cathryn Jones's life and that he nonetheless acted deliberately in conscious disregard of her life?*

Although Andreassen had died only four months earlier and Craven lay in a coma as he began to work on Jones, Protopappas argues these two isolated and unusual cases in no way showed his general procedures were so

dangerous as to imply he acted in conscious disregard for life. He claims to have been exculpated by Jones's doctor's prior approval of the use of general anesthesia. Finally, although Protopappas concedes his failure to check his patient's condition and to respond quickly to her need for oxygen might have shown bad judgment, he urges it was insufficient evidence of a wanton disregard for her life.

These contentions suffer from the same flaws as those proffered with respect to the other two counts of second degree murder. They ignore both the jury's prerogative to reject defense evidence in favor of that offered by the prosecution, and the limits of appellate review. The evidence of implied malice was sufficient to affirm the jury's verdict as to Jones.

The prosecution's experts testified Jones received massive amounts of drugs resulting in her death. Moreover, although Protopappas claimed to have received prior approval for general anesthesia, her physician testified he had not consented to the use of the drugs administered, and would not have, because he realized they posed the risk of respiratory depression. He authorized sodium pentothal only, not Protopappas's standard lethal cocktail which had already killed Andreassen and caused a brain-dead coma in Craven.

As he was extracting her teeth, Protopappas was told three times Jones was turning purple, and yet he refused to stop and give her oxygen. Even when she stopped breathing, her hands became cold and her fingernails turned blue, he finished suturing before giving her oxygen. The jurors were told he failed to respond and reacted with anger, impatience, and indignation at his assistant's observations of Jones's condition. They undoubtedly considered this evidence, coupled with his ineffective and inadequate rescue methods and his failure to call the paramedics immediately, as conduct showing a conscious indifference to whether Jones survived. After what happened to Andreassen and Craven, it is substantial evidence of implied malice that Protopappas again used the standard massive combination of drugs on a sick young woman against her physician's advice, especially in light of his appalling failure properly to monitor her respiration or to act swiftly when it became obvious she was in severe distress.

To summarize, Protopappas did not supply proper general anesthesia or tailor the dosage to the patient. Without the patient's authorization he substituted surrogate dentists who were neither licensed nor qualified to administer general anesthesia. He instructed them to give improperly preset dosages for extended periods with little or no personal supervision and caused multiple patients to receive ever increasing amounts of general

anesthesia at the same time, none of them enjoying his undivided attention. He was also habitually slow in reacting to the resulting overdoses; and in the case of Craven, simply abandoned her.

This is more than gross negligence. These are the acts of "a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (CALJIC No. 8.11; see *People* v. *Watson, supra,* 30 Cal.3d 290, 300.) Moreover, to understand how these facts support a finding of second degree murder sustainable on appeal, it is essential to recall the broad meaning of the somewhat elusive term "malice aforethought." As one leading text explains, "In ordinary conversation the word 'malice' conveys some notion of hatred, grudge, ill-will, or spite, but no such limitation is incorporated in the legal concept of 'malice aforethought.' Many murders are committed to satisfy a feeling of hatred or grudge, it is true, but this crime may be perpetrated without the slightest trace of personal ill-will." (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 58, fns. omitted.) This is clearly the law of California. (*People* v. *Conley, supra,* 64 Cal.2d at pp. 321-322; *People* v. *Spring* (1984) 153 Cal.App.3d 1199, 1204 [200 Cal.Rptr. 849].)

Professors Perkins and Boyce supply a number of examples to illustrate the point: the mother who kills an illegitimate infant out of shame even though she may be filled with maternal love; a mercy killing carried out at the victim's own request; shooting a person with the intent to wound, but not to kill, without justification or provocation; unlawfully attempting to destroy property by explosion where the risk to life is great and which results in an unintended death, despite precautions to prevent injuries to others; carrying a bomb into a place where it poses a danger to life and death results, notwithstanding the perpetrator's desire to avoid detonation or injury; and shooting into inhabited dwellings, automobiles, or trains. (Perkins & Boyce, *supra,* at pp. 58-60, fns. omitted.)

Protopappas's conduct is not meaningfully distinguishable from any of the acts described above. No reasonable person, much less a dentist trained in the use of anesthesia, could have failed to appreciate the grave risk of death posed by the procedures he utilized. It was not a question of *whether* a fatality would occur, only a question of *when*; and ultimately there were three of them.

### IV-VI*

The judgment is affirmed.

Sonenshine, Acting P. J., and Crosby, J., concurred.

Appellant's petition for review by the Supereme Court was denied July 20, 1988.

---

*See footnote 1, *ante*, page 152.