Filed 8/24/23  P. v. Pedraza CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ZAGID LUJANO PEDRAZA,<br><br>    Defendant and Appellant. | D081371<br><br><br>(Super. Ct. No. SCE385858) |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J.  Exarhos, Judge.  Affirmed.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C.  Ragland, Assistant Attorney General, Steve Oetting, Daniel J. Hilton, and Evan Stele, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Zagid Lujano Pedraza appeals from a judgment entered after a jury found him guilty of felony child abuse in violation of Penal Code

1

section 273a, subdivision (a).[1]  He contends there is insufficient evidence to support the child abuse conviction.  Although there is no evidence that Pedraza himself inflicted the abuse, we conclude there is substantial evidence to support a finding that Pedraza acted with criminal negligence by willfully permitting the abuse to be inflicted by the child's mother, Claudia M.  Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *A.L.'s Birth and Primary Caregivers*

A.L. was born without complication in December 2017.  Her mother, Claudia M., and her father, Pedraza, took her home to their apartment.  A.L.'s parents were her primary caregivers and the only adults living in the apartment, where they resided with their three other children ages five, three, and one year old.  The oldest two were Claudia's biological children from a previous relationship.  She and Pedraza were the biological parents of the one year old and newborn A.L.  Occasionally, Claudia's sister and parents would visit the apartment from Tijuana, but Claudia and Pedraza were A.L.'s only primary caregivers.  Pedraza's usual work hours were from 6:00 a.m. to 2:00 p.m.  Claudia reported to senior social worker Christopher T. that she cared for A.L. about 75 percent of the time.  Pedraza also told Christopher that he watched over A.L. at times and Claudia watched over her at other times.

B.      *Prior Hospital Visits*

By the time she turned two months old, A.L. had visited the hospital four times in the span of two weeks.  On February 5, 2018, Claudia brought A.L. to urgent care to address a bloody nose, intermittent bleeding in her gums, coughing, and blood in her stool.  Earlier that day, when Pedraza was

_____

[1]      All further statutory references are to the Penal Code.

2

holding A.L., he noticed blood on A.L.'s shirt and observed that she had a bloody nose. A.L. had been vomiting and running a fever for two days. Claudia also reported to doctors that A.L. had occasionally "developed easy bruising" on her arms and legs. A physical exam revealed one small bruise on A.L.'s left arm measuring one centimeter in diameter.

Due to A.L.'s age and symptoms, she was transported to Rady Children's Hospital's emergency department by ambulance. The attending emergency room trauma doctor noted the "normal range of motion" of A.L.'s arms and legs, which exhibited "no edema, tenderness, deformity or signs of injury." She was "[n]egative for extremity weakness and joint swelling." Lab tests came back mostly normal. Doctors diagnosed A.L. with a respiratory illness and instructed Claudia to schedule a follow up appointment with A.L.'s primary care pediatrician the next day and to return to the emergency room if she noticed any worsening symptoms.

On February 14, 2018, Pedraza took A.L. to urgent care, this time due to white, cloudy coverings on A.L.'s eyes. Claudia arrived at the appointment later. Photographs were taken of A.L.'s eyes and she was referred to ophthalmology with instructions for Claudia to call the following day. Claudia rescheduled then cancelled an appointment for February 16, 2018, then later called to reschedule the appointment again on February 21, 2018.

On February 22, 2018, A.L. was taken to see the urgent care clinic's ophthalmologist, who concluded that the cloudiness in A.L.'s eyes was likely caused by her eyes remaining open and exposed during sleep. The ophthalmologist prescribed eye drops. No photographs were taken. The medical records from this February 22 ophthalmology visit do not specify which parent brought A.L. and contain no mention of bruising or other signs of abuse.

3

C.    *February 24, 2018 Hospital Visit and Removal*

Claudia returned with A.L. to Rady Children's Hospital on February 24, 2018. She reported that A.L. had a fever, trouble eating, pain in her right arm for several days, and bruising. Claudia reported that except for one bruise on A.L.'s lower jaw that had been present for several days, the bruising had appeared that morning and A.L. "woke up [like] this." One doctor noted the bruising on A.L.'s face appeared "old" and "not consistent with [Claudia's] description." Claudia told doctors that A.L. had also been seen several weeks earlier for bruising. Claudia also reported that A.L. had been choking on her formula, though she said it had only started the previous night. A.L. was dehydrated, listless, and had a weak cry.

An attending doctor called Rady's child abuse team for consultation and Dr. Suzanne Starling, the executive director, arrived to evaluate A.L.'s condition and medical history for signs of abuse. Dr. Starling noticed that A.L. had "striking" multiple bruises on her face. A.L. had bruising on her forehead, jaw, both cheeks, and one eyelid, and scrapes on her nose. Dr. Starling testified that infants have elastic skin and minimal strength which make it very difficult for them to bruise without experiencing blunt force trauma. Infants cannot bruise themselves. Dr. Starling explained that the bruising could not be accurately dated, but absent some condition like cancer, would not appear on its own. The bruising appeared consistent with an adult grabbing a baby by the face. Dr. Starling also noticed a bruise on A.L.'s genitalia, which was very uncommon. This bruise would have been impossible for A.L. to have inflicted herself; it likely resulted from a strike to the genitals.

Upon examining A.L.'s mouth, Dr. Starling observed a red cut above her tongue, in the back of her throat. This type of injury results from an

4

object being forced into the back of the mouth. This injury opened a pocket of air in A.L.'s throat, inhibiting her swallowing, causing malnutrition, and eventually requiring a feeding tube. A.L. also had a red mark and swelling on her right arm.

X-rays revealed twenty-eight bone fractures in A.L.'s arms, legs, hands, and feet. She had fractures of every long bone in her body. Dr. Starling testified that the fractures in A.L.'s arms and legs likely resulted from being twisted or pulled, and the fractures in her hands and feet likely resulted from crushing or squeezing. Many of the fractures were a type that is unique to babies, caused by pulling, twisting or jerking the baby's arm or leg, which tears the cartilage away from the end of the bone and takes a piece of the bone with it.

A.L.'s fractures were in several different stages of healing. A fracture with no healing at all is typically up to five days old. Subacute fractures are those just beginning to start the healing process, dating back four to seven or more days. Fractures take several days or weeks for healing to appear. Dr. Starling explained that many fractures in A.L.'s arms and feet were subacute or newly healing, being at least four days old. Most of the fractures in her legs and hands were in a more advanced stage of healing. According to Dr. Starling, a single traumatic injury could not have caused all these fractures, which must have occurred on at least two different occasions.

Dr. Starling noted A.L.'s symptoms of bleeding gums and reported bruising at her first hospital visit on February 5, 2018 could have signaled possible abuse to doctors as mandated reporters. But she explained that "[m]any physicians who are not as well trained as [she] would miss subtle bruising in infants as a form of abuse." Many of the regular trauma doctors

5

at Rady Children's Hospital lack the requisite training to detect subtle signs of abuse.

According to Dr. Starling, any time A.L.'s arms and legs were moved with these types of fractures, it should have been painful. Changing A.L.'s diaper or dressing her would have required movement of her ankles, knees, and hips, all of which were broken. Dr. Starling explained: "So picking up a baby, dressing a baby, diapering a baby, trying to feed a baby while holding a baby actually causes the bones to move around, and they are fractured and so they will hurt."

One of A.L.'s fractures was in the middle of her upper right arm. This caused pain and swelling of the arm, which was one of the reasons Claudia brought A.L. to the hospital. The medical records described A.L. as having an "obvious deformity of her right upper arm" due to this fracture. A.L. was having trouble moving the arm. This type of fracture is known to be painful. It was a subacute fracture that was beginning to heal and was therefore four to seven or more days old.

Another of A.L.'s injuries was a fracture of her right shoulder blade. This was also a subacute fracture that was at least four days old or older. This type of injury would have limited a caretaker's ability to move A.L.'s arms or pick her up by the chest without causing pain. According to Dr. Starling, "we know that those are painful and they cause crying and irritability in infants."

By the time Dr. Starling examined A.L., someone in the hospital ward had already placed A.L. on pain medication, which indicated to Dr. Starling that someone had perceived A.L. to be in pain. A.L. seemed content when she was lying still and watching Dr. Starling, but she began crying when Dr. Starling first tried to move her arms and legs in order to examine her.

6

A.L. faced a long road to recovery. Foster parent Kristi K. visited A.L. in the hospital after receiving a call about her capacity to foster A.L. while social workers evaluated the case. A.L. remained hospitalized for nearly three weeks due to complications with her recovery before Kristi took her into her care. A.L. required a nasal feeding tube due to her inability to swallow, but after she kept knocking it out of place, doctors gave her a gastric feeding tube to deliver nutrients directly into her stomach. As a nurse practitioner, Kristi attended to A.L.'s feeding tube and supervised every visit with A.L.'s parents.

D.    *Subsequent Events*

When Claudia visited A.L. at the hospital in early March 2018, she ignored Kristi's guidance on how to hold her baby without hurting her, and instead "flung" A.L. over her shoulder. Claudia "jerked" A.L. by her stomach, where A.L. had recently undergone surgery to insert her feeding tube. In contrast, Pedraza held A.L. very gently, cried, and said he was sorry during his visit that same day.

Kristi continued to observe this divergent behavior during subsequent supervised visits throughout the following months. She described Claudia's "detached" behavior as "night and day" from that of Pedraza, who enjoyed playing with A.L. and took care to be gentle. Kristi described Claudia as not having "a maternal bone in her body." Social workers Christopher T. and Judy W. also observed this contrasting behavior during supervised visits.

A.L. exhibited what Christopher referred to as "a stranger-danger response" when she saw Christopher during visits. She would cling to her foster mother and was hesitant to let Christopher see or touch her. A.L. was similarly "standoffish" with Pedraza during a visit on October 12, 2018 and constantly went back to her foster mother for reassurance.

During visits, Pedraza generally acted appropriately with A.L. and would kneel to color, play, and read with her. At times, when Pedraza asked to hold her, A.L. shook her head no, but at other times, she fell asleep in his arms comfortably. When A.L. did not allow Pedraza to pick her up, she seemed to enjoy playing with him. Pedraza brought A.L. stuffed animals and books, talked to A.L., and told her he loved her. At one visit, A.L. used her blanket to play peekaboo and said "bye" to Pedraza before he left.

But Pedraza also missed a number of scheduled visits without notifying social workers. Pedraza refused to communicate with Christopher for a period under the advice of counsel, and while he ultimately attended child abuse classes, he resisted the treatment at first. Judy did not think the visits were going well and perceived A.L. to be afraid of Pedraza.

Pedraza told Judy, Christopher, and Kristi that he did not know what had caused A.L.'s injuries. Pedraza informed Christopher that he had noticed some injuries, but not all, before A.L. left his custody. When asked about Claudia, Pedraza stated he thought she was a great mother, but conceded that "you don't just wake up with these types of injuries." Judy ultimately recommended terminating Pedraza's parental rights because of the visits, the extent of the injuries, and the fact that Pedraza could not tell her what happened to A.L.

E.    *Prosecution and Conviction*

Pedraza and Claudia were charged with willfully causing or permitting a child to suffer unjustifiable physical pain or mental suffering under circumstances likely to produce great bodily injury in violation of section 273a subdivision (a). Claudia pled guilty. Pedraza went to trial.

8

The jury found Pedraza guilty of felony child abuse in violation of section 273a, subdivision (a). The trial court sentenced him to two years with credit for time served and fined him $5,000 satisfied by time in custody.

DISCUSSION

Pedraza contends there is insufficient evidence to support his conviction for felony child abuse under section 273, subdivision (a). Viewing the evidence and drawing all reasonable inferences in favor of the judgment, we conclude there is sufficient evidence that Pedraza acted with criminal negligence by willfully permitting Claudia to inflict the abuse.

A. *Standard of Review*

We apply the substantial evidence standard of review in evaluating a sufficiency of evidence claim. (*People v. Rivera* (2019) 7 Cal.5th 306, 323.) We examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117–1118.) We presume true every fact and every inference reasonably drawn from the evidence, direct and circumstantial, that would support the judgment. (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)

We cannot venture beyond the evidence presented at trial and may consider only those inferences that are reasonably supported by the record. (*People v. Ware* (2022) 14 Cal.5th 151, 167–168 (*Ware*).) A reasonable inference " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.) It must rest on the evidence and not merely " 'on the suspicions of the officers involved in the case and the

9

conjecture of the prosecution.' " (*Ware*, at p. 168.) "[A] decision supported by a 'mere scintilla of evidence' need not be affirmed on review." (*In re G.Z.* (2022) 85 Cal.App.5th 857, 876, internal quotation marks omitted.) However, we must accept all logical inferences that the trier of fact may have drawn from circumstantial evidence. (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233.)

In assessing the sufficiency of evidence, we must take into account the reasonable doubt standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1007–1008.) The relevant question is not whether *we* are satisfied of the defendant's guilt beyond a reasonable doubt; "it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Id.* at p. 1009.)

B.    *Governing Legal Principles*

Section 273a, subdivision (a) defines and criminalizes felony child abuse and endangerment. It is " 'an omnibus statute that proscribes essentially four branches of conduct.' " (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*).) The statute applies to " '[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . .' " (*People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*).)

A violation of section 273a, subdivision (a) " 'includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect.' " (*Sargent, supra,* 19 Cal.4th at pp. 1215–1216.) Direct

10

infliction of abuse is a general intent crime similar to battery or assault. (*Id.* at p. 1220.)

Willful conduct is an essential element of all types of felony child abuse. (*Sargent, supra,* 19 Cal.4th at p. 1216.) "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate [the] law, or to injure another, or to acquire any advantage." (§ 7, subd. (1); *Valdez, supra,* 27 Cal.4th at pp. 787–788.)

The Supreme Court has held that criminal negligence is the necessary mens rea for *indirect* infliction of abuse. (*Valdez, supra,* 27 Cal.4th at p. 789.) "[C]riminal negligence is the appropriate standard when the act is intrinsically lawful, such as leaving an infant with a babysitter, but warrants criminal liability because the surrounding circumstances present a high risk of serious injury." (*Ibid.*)

Assessing criminal negligence requires a two-step test to evaluate actual or constructive knowledge and degree of negligence. First, the trier must determine whether the defendant knew, or should have known, that his act or omission presented a substantial risk of great bodily harm to a child. "Under the criminal negligence standard, knowledge of the risk is determined by an objective test: '[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness.' " (*Valdez, supra,* 27 Cal.4th at p. 783, internal quotation marks omitted; *ibid.* [further stating "there can be no criminal negligence without actual or constructive knowledge of the risk"]; see also *Walker v. Superior Court* (1988) 47 Cal.3d 112, 136–137.)

Next, the trier must decide whether defendant's act or omission so grossly departed from what an ordinarily prudent person in the same

11

circumstances would do as to be incompatible with or indifferent to a respect for human life.  Ordinary negligence or accidental conduct does not suffice to constitute felony child abuse.  (*Valdez*, *supra*, 27 Cal.4th at pp. 788–789.) Criminal negligence "must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences."  (*Valdez*, at p. 788; *People v. Penny* (1955) 44 Cal.2d 861, 879, internal quotation marks omitted.)

C.     *Substantial Evidence Supports Pedraza's Conviction*

Under the instructions given by the trial court, the jury could have found Pedraza criminally negligent under either of two theories: that Pedraza (1) willfully *caused* A.L.'s injuries, or (2) willfully *permitted* Claudia to injure her.[2]  On appeal, however, the People do not seriously contend that there is sufficient evidence to prove beyond a reasonable doubt that Pedraza himself

_____

[2]     The court instructed the jury that "the People must prove that:  [¶] 1. The defendant, while having care or custody of a child, willfully caused or permitted the child's person or health to be injured;  [¶]  2. The defendant inflicted pain or suffering on the child or caused or permitted the child to be injured or be endangered under circumstances or conditions likely to produce great bodily harm;  [¶]  AND  [¶]  3. The defendant was criminally negligent when he caused or permitted the child to suffer or be injured or be endangered."  The court defined "willfully" for the jury as follows: "Someone commits an act willfully when he or she does it willingly or on purpose." (Emphasis omitted.)  The court defined "criminal negligence" as follows: "Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment.  A person acts with criminal negligence when:  [¶] 1. He or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act in the same situation.  [¶]  2. The person's acts amount to disregard for human life or indifference to the consequences of his or her acts;  [¶]  AND  [¶]  3. A reasonable person would have known that acting in that way would naturally and probably result in harm to others." (Emphasis omitted.)

12

inflicted A.L.'s injuries. At trial, the prosecutor admitted to the jury that one of the "unanswered questions" was "who inflicted [A.L.]'s injuries." The prosecutor conceded "it is still unclear who did it, who actively hurt [A.L.], whether it was [Claudia], whether it was [Pedraza] or whether it was both." The prosecutor admitted, "I can't prove to you which one of them" actually inflicted the injuries.

We agree there is no evidence to support a finding that Pedraza himself perpetrated A.L.'s injuries. For purposes of the appeal, therefore, we must assume that Pedraza was not the actual perpetrator. That leaves only the alternative theory that Pedraza was criminally negligent in willfully permitting Claudia to injure A.L. (See *People v. Peabody* (1975) 46 Cal.App.3d 43, 36 ["Because there is no evidence that appellant herself inflicted the injuries upon her baby, the conviction can stand only under that portion of the statute which proscribes a person from willfully causing or permitting a child to be placed in a health endangering situation under circumstances likely to produce great bodily harm or death." (Italics omitted.)].)

Viewing the record in the light most favorable to the prosecution, we conclude there is substantial evidence to support a finding that Pedraza acted with criminal negligence by willfully permitting the ongoing abuse of A.L. with actual or constructive knowledge that it was occurring. (*Valdez, supra*, 27 Cal.4th at p. 783.) Pedraza and Claudia were A.L.'s only caregivers, and they lived together in an apartment with their three other children. Although Pedraza worked eight hours a day, and there is no direct evidence of his normal activities in caring for the four children at home, Pedraza did admit that he cared for A.L. at times and Claudia cared for her at other times. Claudia also estimated that she cared for A.L. 75 percent of the time

13

and Pedraza cared for her 25 percent of the time. It was Pedraza who noticed A.L.'s bloody nose when he was holding her on February 5, 2018, and he demonstrated an emotional attachment to her after she was removed from his custody. From this evidence, the jury could reasonably infer that Pedraza was actively involved in A.L.'s care and must have regularly done the things that any caregiver would do in taking care of a two-month-old baby, such as picking her up, holding her, changing her diaper, bathing her, and clothing her.

The record also supports an inference that someone in Pedraza's position would have noticed A.L.'s severe injuries while caring for her before February 24, 2018. Pedraza himself admitted to social worker Christopher that he had noticed some of A.L.'s injuries before her removal. He also acknowledged that "you don't just wake up with these types of injuries." By the time of the February 24 hospital visit, A.L. had already been to the hospital three times in the same month. A.L. had obvious bruises to her face and body when Claudia brought her to the hospital on February 24, and she had been experiencing pain to her arm for several days. A.L. also could not eat because of the internal injury to the back of her throat, and she was dehydrated. A.L. had a prior history of bruising within the first six weeks of her life, and Claudia reported that A.L. had been seen at the hospital for bruising two weeks earlier. Claudia also reported that one bruise on A.L.'s lower jaw had been present for several days, and a doctor further noted that the rest of the bruising on A.L.'s face appeared "old" and "not consistent with [Claudia's] description."

A.L. was also suffering from 28 bone fractures in various stages of healing. These bone fractures were inflicted on more than one occasion by forcible twisting, jerking, pulling, crushing, or squeezing of the baby's limbs,

14

hands, and feet. Many of A.L.'s bone fractures were in the "subacute" stage of healing, meaning that they were at least four to seven days old or older, and others were in an even more advanced stage of healing. The subacute fractures included the ones in the middle of her right arm and on her right shoulder, both of which would have caused pain with movement of the arm. A.L. was in fact having trouble moving the arm, which had an "obvious deformity" from the fracture. According to Dr. Starling, A.L.'s bone fractures would have caused pain when she was changed, dressed, or held. Even after A.L. received pain medication in the hospital, she still began crying when Dr. Starling moved her around to examine her.

Based on the totality of the evidence, the jury could infer that a reasonable person in Pedraza's position acting as one of A.L.'s primary caretakers would have realized that she was suffering from pain and serious injuries caused by ongoing abuse well before February 24, 2018. Most clearly, the record supports a finding that A.L. must have had noticeable pain from the fractures of her upper right arm and shoulder that were at least four to seven days old. When combined with all the other bone fractures (some of which were even older) and the history of bruising, the totality of the record supports a finding that Pedraza had actual or constructive knowledge of the abuse, but failed to do anything to protect A.L.

There was also evidence from which the jury could conclude that Claudia made no efforts to conceal her violent treatment of A.L. When Claudia visited A.L. in the hospital, A.L.'s foster mother instructed her to be careful holding A.L. and specifically told her that holding A.L. over the shoulder would hurt A.L. because of her fractures. Yet Claudia "grabbed her and flung her over her shoulder" anyway, causing A.L. to scream in pain. Claudia also "jerked" A.L. by her stomach, where A.L. had recently

undergone surgery to insert her feeding tube. A.L. "was screaming in pain," but Claudia "wasn't concerned at all." According to the foster mother, Claudia exhibited "[z]ero concern" for A.L. A social worker was also present outside the room observing this visit. The jury could reasonably infer that if Claudia was so blatantly rough with A.L. right in front of a social worker and the foster mother, she would not have concealed it from Pedraza in the privacy of their own home.

Pedraza relies on the fact that none of the doctors who treated A.L. in the weeks before February 24, 2018 detected any signs of abuse. Although this was a significant factor for the jury to weigh in Pedraza's defense, it did not compel a verdict in his favor. Based on Dr. Starling's testimony, the jury could have found that A.L.'s presenting injuries on February 24 were likely inflicted *after* her hospital visits on February 5 and 14. Moreover, there is no evidence that the doctor who examined A.L.'s eyes on February 22 picked her up or moved her limbs, as a caregiver would have to do. As Dr. Starling explained, babies with these types of fractures typically cry more when being handled than when lying still, because picking them up jostles their fractures and makes them hurt more. When Dr. Starling herself examined A.L., for example, A.L. was initially content when she was lying still, but began crying when Dr. Starling tried to move her. Thus, the jury could have concluded that a daily caregiver in Pedraza's position who regularly had to hold A.L. and move her body to change and clothe her would have noticed her pain and would have done something to protect her, especially with the accompanying history of bruising.

Pedraza also relies on the fact that he brought A.L. to urgent care for the problem with her eyes on February 14, 2018. But this does not absolve Pedraza from responsibility for failing to do anything to protect A.L. from the

16

continuing abuse over the next ten days. Notably, it was not Pedraza who ultimately brought A.L. to the hospital on February 24; it was Claudia. Thus, the jury could reasonably have concluded that Pedraza did nothing to protect A.L. or seek medical attention for her after she must have been exhibiting noticeable signs of abuse well before February 24. And Pedraza does not dispute that if he knew or should have known of the abuse, his failure to protect A.L. from further abuse constituted a gross departure from what an ordinarily prudent person would do in the same circumstances. (*Valdez*, *supra*, 27 Cal.4th at pp. 788–790.)

Finally, Pedraza argues that the facts of this case do not compare to those of other cases finding *sufficient* evidence of felony child abuse in vastly different circumstances. (*People v. Perez* (2008) 164 Cal.App.4th 1462, 1465–1466; *People v. James* (1987) 196 Cal.App.3d 272, 284; *People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1673; *People v. Clair* (2011) 197 Cal.App.4th 949, 954–955.) This mode of reasoning is unpersuasive. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

In sum, we conclude there is sufficient evidence to support the finding that Pedraza acted with criminal negligence by willfully permitting ongoing physical abuse of A.L. by another. (§ 273a, subd. (a).)

17

## DISPOSITION

The judgment is affirmed.


                                                    BUCHANAN, J.

WE CONCUR:



McCONNELL, P.J.



KELETY, J.